702 So.2d 186 (1997)
Oba CHANDLER, Appellant,
v.
STATE of Florida, Appellee.
No. 84812.
Supreme Court of Florida.
October 16, 1997.
Rehearing Denied December 11, 1997.
*188 James Marion Moorman, Public Defender and Paul C. Helm, Assistant Public Defender, Tenth Judicial Circuit, Bartow, for Appellant.
Robert A. Butterworth, Attorney General and Candance M. Sabella, Assistant Attorney General, Tampa, for Appellee.
PER CURIAM.
We have on appeal the judgments and sentences of the trial court imposing the death penalty upon appellant Oba Chandler. *189 We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm Chandler's first-degree murder convictions and sentences of death.

FACTS
The record reflects that the body of Joan Rogers and those of her two daughters, Michelle and Christe, were discovered floating in Tampa Bay on June 4, 1989. Each body was nude from the waist down. Joan's hands were tied behind her back, her ankles were tied together, and the yellow rope around her neck was attached to a concrete block. Christe's hands and ankles were similarly tied, and she had duct tape on her face or head and a rope around her neck.[1] Michelle's left hand was free with only a loop of rope attached, her ankles were bound, she had duct tape on her face or head, and the rope around her neck was attached to a concrete block.
The assistant medical examiner, Dr. Edward Corcoran, performed autopsies that same day. He determined that the cause of death for each victim was either asphyxiation due to strangulation from the ropes tied around their necks or drowning.
The Rogers family was vacationing in Florida and had checked into a Days Inn in Tampa on June 1. One week later, housekeepers notified the general manager that the Rogers' room had not been inhabited for several days. The general manager contacted the police, who secured the room and obtained the hotel's records for the room. The police subsequently found the Rogers' car parked at a boat ramp on the Courtney Campbell Causeway.
Among the items recovered from the car was a handwritten note on Days Inn stationery and a Clearwater Beach brochure. The note read, "Turn right. West W on 60, two and one-half miles before the bridge on the right side at light, blue w/wht." FBI agent James Mathis determined that the handwriting was that of Joan Rogers. Theresa Stubbs from FDLE determined that some of the handwriting on the Clearwater Beach brochure was Chandler's, while other writing may have been Joan Rogers'. Samuel McMullin, a fingerprint expert for the Hillsborough County Sheriff's Department, found Chandler's palm print on the brochure.
Rollins Cooper worked as a subcontractor for Chandler at the time of the murders. He testified at trial that on June 1, Chandler appeared to be in a big hurry after bringing Cooper some screen. When asked why, Chandler told Cooper that he had a date with three women. Cooper met Chandler the next morning at 7:05 a.m.; when asked why he looked grubby, Chandler replied that he had been out on his boat all night.
Judy Blair and her friend, Barbara Mottram, both Canadian tourists, testified regarding Chandler's rape of Blair several weeks prior to the Rogers' murders. After meeting the women at a convenience store, Chandler, who identified himself as "Dave," arranged to take them out on his boat the next day. The following morning, May 15, 1989, Mottram decided not to go out on Chandler's boat, so Blair met Chandler alone. Blair testified that Chandler seemed disappointed when told Mottram would not be joining them. After boating for several hours, Blair and Chandler returned to the dock. Chandler asked Blair to get Mottram to join them for an after-dinner boat trip.
Again, Blair could not convince Mottram to join them. Blair testified that Chandler seemed "ticked off" when she told him Mottram would not be joining them. Subsequently, Chandler began making advances to Blair after the boat entered the Gulf of Mexico. Despite Blair's refusals and attempts to resist him, Chandler raped her. Chandler and Blair then returned to shore. The next day, Blair told Mottram what happened and reported the rape to the police. At trial, she identified the clothing Chandler had been wearing that night. Mottram picked Chandler's photograph out of a photo pack and identified him in a lineup and in court.
Chandler visited his daughter, Kristal Mays, and her husband Rick in Cincinnati in November 1989. Kristal later testified that Chandler told her he could not go back to *190 Florida because the police were looking for him for killing some women. While Chandler never admitted to the killings, Kristal testified that he likewise never claimed innocence. Similarly, Rick Mays thought Chandler had committed the murders from the way he described how the police were looking for him as a murder suspect.
During another visit to Cincinnati in October 1990, Chandler had Rick Mays set up a drug deal. Before absconding with some of the drug dealers' money, Chandler put a gun to Rick's head and said, "Family don't mean s___ to me." After Chandler fled, Rick was badly beaten up and almost killed. The Mays' house was also damaged by the drug dealers. This series of incidents forced Kristal Mays to drop out of nursing school. She was upset and told Rick to call the police and report that Chandler "put a gun on him."
After Chandler was arrested in September 1992, Kristal was contacted and cooperated with the police and she began to tape their conversations. She gave a sworn statement to the state attorney's office on October 6, 1992. Kristal had been convicted of a crime involving dishonesty and appeared on the television show Hard Copy in 1994 to discuss her father's alleged role in the murders in return for a $1000 fee.
Robert Carlton testified that he bought a blue and white boat from Chandler in July or August 1989. Carlton recalled seeing concrete blocks at the Chandler house and that some of the concrete blocks had three holes and some had two.
Arthur Wayne Stephenson shared a cell with Chandler for ten days in late October 1992. He testified at trial that after viewing television reports about the recovery of the victims' bodies from Tampa Bay, Chandler said that he had met the three women and given them directions to a boat ramp on the Courtney Campbell Causeway. Chandler told Stephenson that one of the girls was very attractive.
Blake Leslie, an inmate at the Pinellas County Jail with Chandler in the fall of 1992, testified that Chandler told him that he took a young lady from another country for a ride in his boat. Her friend did not want to go. Once he got out twenty to thirty miles, Chandler told her to have sex with him or swim for it. Chandler allegedly said that the only reason that woman was still around is because somebody was waiting for her at the boat dock. Leslie, who had been convicted of nine felonies, never heard Chandler speak of murders, only rapes.
Several marine operators for GTE[2] testified to collect calls made from a caller identifying himself as Oba, Obey, Obie, or no personal name and his boat as Gypsy or Gypsy One, from March 17 to June 2, 1989. The calls were placed to a number registered to Debra Chandler, Chandler's wife. One of the operators, Elizabeth Beiro, testified that she received three collect calls for Debra Chandler's telephone number, at 1:12 and 1:30 a.m. on June 2, 1989. The caller did not give a first name, although he identified his boat as Gypsy One. Later that same morning, at 9:52 a.m., Frances Watkins received a collect call from Gypsy One; the caller identified himself as Obie.
Chandler testified that he met Michelle Rogers when he stopped at a gas station. He testified that he had a very brief conversation with Michelle, giving her directions to the Days Inn on Highway 60. Chandler maintained that he never saw any of the Rogers family again after this short encounter and adamantly denied killing them. He also testified that he never told Rollins Cooper that he had a date with three women. Chandler claimed that he was out on his boat all night because his engine died after a hose burst, spilling all of his fuel. He testified that two men in a boat gave him a tow to Gandy Bridge Marina, where he put some fuel in his boat. In rebuttal, James Hensley, a certified boat mechanic, testified that Chandler's fuel line was possibly still the original, was in good shape, and showed no signs of repair. Hensley stated that even if there had been a hole in the fuel line, it would not have leaked because of the antisyphoning valve.
When asked about details surrounding the rape of Judy Blair, Chandler invoked his *191 Fifth Amendment right to remain silent twenty-one times, although he did answer some questions regarding his perception of the link between the rape and the murders.
After the jury trial concluded, Chandler was found guilty of all three counts of murder on September 29, 1994. The jury reconvened for the penalty phase the next day. During the penalty phase, Chandler waived the presentation of any testimonial mitigating evidence. However, he did present some documentary evidence, including records showing that he obtained his high school equivalency diploma and earned college credits while in prison. The State presented the judgments and sentences of Chandler's prior armed robberies. The robbery victims also testified about the details of those crimes.
The jury recommended a death sentence for each of the murders by a vote of twelve to zero later that same day. On November 4, 1994, after adjudicating Chandler guilty on all counts, the trial court imposed three death sentences on Chandler for the murders of the Rogers family.[3]

APPEAL
Chandler raises seven claims of error on appeal.[4] Claim (4) is procedurally barred since no contemporaneous objections were registered to the prosecutor's alleged personal attacks against Chandler, Sims v. State, 681 So.2d 1112, 1116-17 (Fla.1996) cert. denied, ___ U.S. ___, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997), or to any of the other allegedly improper prosecutorial comments, nor were any accompanying motions for mistrial made. Allen v. State, 662 So.2d 323, 328 (Fla.1995)(requiring contemporaneous objection and accompanying motion for mistrial to preserve allegedly improper prosecutorial comments for appellate review). Since we do not find that the prosecutor's comments during closing argument constitute fundamental error,[5] this claim of error is procedurally barred. See Kilgore v. State, 688 So.2d 895, 898 (Fla.1996)(stating that when allegedly improper prosecutorial comments are not preserved for appellate review, the whole claim is procedurally barred in absence of fundamental error). We address the remaining issues in turn.

Collateral Crime Evidence
As his first claim of error, Chandler contends that the trial court erred in admitting collateral crime evidence regarding the rape of Judy Blair. As the parties note, we established the rule regarding admission of collateral crime evidence in Williams v. State, 110 So.2d 654 (Fla.1959), and enunciated the following standard for admitting such evidence:
Our view of the proper rule simply is that relevant evidence will not be excluded *192 merely because it relates to similar facts which point to the commission of a separate crime. The test of admissibility is relevancy. The test of inadmissibility is a lack of relevancy.
Id. at 659-60. More recently, in Hayes v. State, 660 So.2d 257 (Fla.1995), we observed that:
The Evidence Code, under section 90.404(2)(a), Florida Statutes (1993), allows a party to introduce similar fact evidence of other crimes when it is relevant to prove a material fact in issue. In Drake v. State, 400 So.2d 1217 (Fla.1981), we set forth the principles of how this evidentiary provision should be applied. See also Thompson v. State, 494 So.2d 203 (Fla.1986); Peek v. State, 488 So.2d 52 (Fla.1986). In Drake, we stated:

Williams v. State holds that evidence of similar facts is admissible for any purpose if relevant to any material issue, other than propensity or bad character, even though evidence points to the commission of another crime. The material issue to be resolved by the similar facts evidence in the present case is identity, which the State sought to prove by showing Drake's mode of operating.
The mode of operating theory of proving identity is based on both the similarity of and the unusual nature of the factual situations being compared. A mere general similarity will not render the similar facts legally relevant to show identity. There must be identifiable points of similarity which pervade the compared factual situations. Given sufficient similarity, in order for the similar facts to be relevant the points of similarity must have some special character or be so unusual as to point to the defendant.

Drake, 400 So.2d at 1219 (emphasis added).
Hayes, 660 So.2d at 261 (second emphasis added) (citations omitted). The common thread in our Williams rule decisions has been that startling similarities in the facts of each crime and the uniqueness of modus operandi will determine the admissibility of collateral crime evidence.
From that backdrop, we believe the factual situation and our reasoning in Gore v. State, 599 So.2d 978 (Fla.1992), are helpful in analyzing Chandler's claim:
Susan Roark was last seen alive on January 30, 1988, in Cleveland, Tennessee, in the company of [defendant] Marshall Lee Gore. Gore had planned to travel to Florida with a friend from Cleveland. While waiting for his friend at a convenience store, Gore struck up a conversation with Roark. Gore then entered Roark's car, a black Mustang, and they drove away.
Gore accompanied Roark to a party at the home of a friend of hers. Roark had planned to spend the night at her friend's home. Sometime between 11:30 and 12:00, Roark left to drive Gore home. She never returned. The following day Roark's grandmother reported her missing. She had been expected home by 7 a.m. that morning.
Gore arrived in Tampa on January 31, driving a black Mustang. He convinced a friend to help him pawn several items of jewelry later identified as belonging to Roark. Gore then proceeded to Miami, where police subsequently recovered Roark's Mustang after it was abandoned in a two-car accident. Gore's fingerprint was found in the car, as well as a traffic ticket which had been issued to him while he was in Miami.
On April 2, 1988, the skeletonized remains of Roark's body were discovered in Columbia County, Florida....
....
The testimony of Tina Corolis was admitted as evidence of a collateral crime. Corolis was a casual acquaintance of Gore's, whom she knew as "Tony." In March of 1988, Gore called Corolis at her home and told her that his car had broken down and he needed a ride to it. After they had driven around for several hours, Gore revealed a knife, gained control of the car, and drove to a partially wooded dumping area off a dirt road. He put the knife to Corolis' stomach, forced her to undress, and raped her. He then dragged her out of the car, punched her face against a rock, *193 strangled her, and stabbed her in the neck, arms, legs, and buttocks. Shortly thereafter Gore pawned several items of Corolis' jewelry and then proceeded to Kentucky in her car.
....
Gore argues that this case is comparable to Drake v. State, 400 So.2d 1217 (Fla. 1981), in that the collateral crime is not sufficiently similar to the crime at issue and the claimed similarities are not unique enough to qualify as evidence of identity.... In rejecting the collateral crimes evidence as evidence of the identity of the murderer, we noted that "[a] mere general similarity will not render the similar facts legally relevant to show identity. There must be identifiable points of similarity which pervade the compared factual situations." Id. at 1219.

We find that the Corolis crime does have the required pervasive similarities. The significant common features of the two crimes include the following: The victim was a small female with dark hair; Gore introduced himself as "Tony"; he had no automobile of his own; he was with the victim for a lengthy amount of time before the attack began; he used or threatened to use binding; the attack had both a sexual and pecuniary motive; the victim suffered trauma to the neck area; Gore transported the victim to the site of the attack in the victim's car; the victim was attacked at a trash pile on a dirt road, where the body was then left; Gore stole the victim's car and jewelry; he pawned the jewelry shortly after the theft; he fled in the victim's automobile, leaving the state where the victim was apprehended and staying with a friend or relative for a period of time after the crime; and he represented the car to be a gift or loan from a girlfriend or relative.
Gore argues that there are dissimilarities between the two incidents as well.... Here, however, the similarities are pervasive, and the dissimilarities insubstantial. This Court has never required the collateral crime to be absolutely identical to the crime charged. The few dissimilarities here seem to be a result of differences in the opportunities with which Gore was presented, rather than differences in modus operandi. See Chandler v. State, 442 So.2d 171, 173 (Fla.1983). For example, the most significant difference between the two crimesthat Roark was murdered while Corolis was notseems to be more of a fortuitous circumstance than a reflection of Gore's intent in the Corolis crime, since he beat her, stabbed her, and left her for dead in an isolated area.
Gore also argues that the similar features of the two crimes are not sufficiently unique to serve as evidence of identity.... While the common points between the Corolis assault and the Roark murder may not be sufficiently unique or unusual when considered individually, they do establish a sufficiently unique pattern of criminal activity when all of the common points are considered together. The cumulative effect of the numerous similarities between the two crimes is the establishment of a unique modus operandi which points to Gore as the perpetrator of the Roark homicide. We find no error in the admission of evidence of Gore's attack on Corolis.
Id. at 980-84 (emphasis added).
In this case, the trial court's detailed order admitting the collateral crime evidence found the following fourteen similarities between the Blair rape and the Rogers' murders: (1) All the victims were tourists; (2) the victims were young white females between 14 and 36; (3) the victims were similar in height and weight; (4) the victims met Chandler by chance encounter where he rendered assistance to them; (5) the victims agreed to accompany Chandler on a sunset cruise within twenty-four hours of meeting him; (6) Chandler was non-threatening and convincing that he was safe to be with alone; (7) a blue and white boat was used for both crimes; (8) a camera was taken to record the sunset in both crimes; (9) duct tape was used or threatened to be used; (10) there was a sexual motive for both crimes; (11) the crimes occurred in large bodies of water in the Tampa Bay area on a boat at night under the cover of darkness; (12) homicidal violence occurred or was threatened; (13) the crimes occurred within seventeen or eighteen *194 days of each other; and (14) telephone calls were made to Chandler's home from his boat while still embarked either before or after these crimes. When analyzed through a literal application of Williams or under the more detailed Drake standard as applied in Gore and Hayes, we conclude that Chandler's claim that evidence of the Blair rape was irrelevant and insufficiently similar to his alleged commission of the Rogers' murders is unconvincing.[6]
On the contrary, we find that the "identifiable points of similarity which pervade the compared factual situations," Drake, 400 So.2d at 1219, include "chance encounters" in public places with young female tourists to whom Chandler offered assistance; almost immediate offers of cruises on his boat; the same blue and white boat used for both crimes; a warm, non-threatening demeanor that convinced the eventual victims to accompany Chandler on his boat within twenty-four hours of meeting him; sexual motive with all victims stripped from the waist down; use or threatened use of duct tape; crimes occurring in large bodies of water under cover of darkness; murder committed or threatened; and commission of the crimes within a brief time frame seventeen to eighteen days of each other.
We recognize that the crimes are not exactly the same. However, that fact alone does not preclude admission of collateral crime evidence and, indeed, would erect an almost impossible standard of admissibility. Gore, 599 So.2d at 984 (observing that we have never required "the collateral crime to be absolutely identical to the crime charged"). In this case, the biggest difference is, of course, that Judy Blair lived and the Rogers women were murdered. However, even that dissimilarity may be attributed to "differences in the opportunities with which [Chandler] was presented, rather than differences in modus operandi." Id. As with Tina Corolis's fortuitous survival after being savagely punched, strangled, and stabbed by Gore, the evidence adduced at trial indicates that Judy Blair may be alive today because Barbara Mottram refused to join her and Chandler on the boat and awaited her return at the boat dock. We note that Mottram refused to go for a cruise not once, but twice. Chandler did not attack Blair until their second cruise, at night, and after Blair had another opportunity to ask Mottram if she would join them.
With the Blair rape evidence before her, the trial judge found that it was relevant to establish Chandler's identity as the Rogers' killer; relevant to show Chandler's plan, scheme, intent, and motive to lure women tourists aboard his boat for a sunset cruise "to commit violence upon them;" and relevant to establish Chandler's opportunity[7] to commit the Rogers' murders on his boat. Accordingly, *195 the trial judge concluded that the "unique similarities in these two crimes tie the same individualOba Chandlerto both crimes." Since the two crimes "establish a sufficiently unique pattern of criminal activity when all of the common points are considered together," Gore, 599 So.2d at 984, and the evidence presented Chandler's "unique modus operandi," id., we find no abuse of discretion in the trial court's admission of the Williams rule evidence.

Fifth Amendment Right to Remain Silent
As his next claim of error, Chandler asserts that the trial court erred in forcing him, in effect, to repeatedly invoke his Fifth Amendment right against self-incrimination before the jury in response to questions about the Blair rape. This claim is without merit.
At the outset, we agree with the State that much of Chandler's claim that crossexamination impermissibly exceeded the scope of direct examination is procedurally barred since no contemporaneous objection was made. Geralds v. State, 674 So.2d 96, 99 (Fla.), cert. denied, ___ U.S. ___, 117 S.Ct. 230, 136 L.Ed.2d 161 (1996). Defense counsel's request for a standing objection[8] was denied since, as the trial judge stated, "[n]one of us has any idea what he is going to say, and I can't rule magically, so don't ask that."[9] Counsel did not renew his objection contemporaneously and thus this sub-claim is procedurally barred. Geralds.
As to Chandler's claim regarding the prosecutor's questions about the Blair rape, we believe that this issue constitutes a classic case of trying to take the wind out of your opponent's sails by pre-emptively admitting extremely prejudicial evidence and thereby softening the blow. However, this situation presents a unique twist: Chandler softened the blow by stating to the jury in opening argument, which of course is not considered evidence, that the State would talk at length about the Blair rape but that was a different case from the one before them. Thereafter, when the time came, defense counsel did not allude to the Blair rape during his direct examination of Chandler. In that way, the State presumably could not address that subject matter when cross-examining Chandler since the issue was not broached on direct examination. See Hunter v. State, 660 So.2d 244, 251 (Fla.1995) (finding trial court did not err in limiting attempted cross-examination of police detective which was "clearly outside the scope of direct"); § 90.612(2), Fla. Stat. (1993)(limiting cross examination "to the subject matter of direct examination and matters affecting the credibility of the witness ... [although the] court may, in its discretion, permit inquiry into additional matters").
Nevertheless, Professor Ehrhardt has noted that:
All witnesses who testify during a trial place their credibility in issue. Regardless of the subject matter of the witness' testimony, a party on cross-examination may inquire into matters that affect the truthfulness of the witness' testimony. Although cross-examination is generally limited to the scope of the direct examination, the credibility of the witness is always a proper subject of cross-examination. The credibility of a criminal defendant who *196 takes the stand and testifies may be attacked in the same manner as any other witness.
Charles W. Ehrhardt, Florida Evidence § 608.1 at 385 (1997 ed.) (footnotes omitted). See also Shere v. State, 579 So.2d 86, 90 (Fla.1991) (recognizing the general rule that the "purpose of cross examination is to elicit testimony favorable to the cross-examining party ... and to challenge the witness's credibility when appropriate"). Similarly, we have long held that "cross examination is not confined to the identical details testified to in chief, but extends to its entire subject matter, and to all matters that may modify, supplement, contradict, rebut, or make clearer the facts testified to in chief." Geralds v. State, 674 So.2d 96, 99 (Fla.1996) (quoting Coco v. State, 62 So.2d 892, 895 (Fla.1953)); Coxwell v. State, 361 So.2d 148, 151 (Fla. 1978) (same).
In Geralds, we recently denied a similar claim from the defendant that the prosecutor's cross-examination about evidence linking him to the murder was beyond the scope of the defendant's testimony on direct. 674 So.2d at 99-100. We noted that on direct examination, the defendant's testimony covered six general subjects, including his denial that he murdered the victim. Id. at 100. Since the defendant opened the door on that subject, we concluded that the trial court did not abuse its discretion in allowing questions about evidence linking the defendant to the crime. Id.
Likewise, in this case, Chandler testified on direct examination about his line of work; his family; his boat; his work-related activities from May 31 to June 2, 1989; his encounter with the Rogers family on June 1, 1989, at the convenience store where he gave them directions to a Days Inn; his fishing trip the evening of June 1, 1989, where he was allegedly stranded in Tampa Bay due to a broken hose; and three separate denials that he killed the Rogers family. The crux of Chandler's defense was that he met Michelle Rogers only briefly at the convenience store where he gave her directions to a Days Inn; he did not take the Rogers family for a cruise that night;[10] and he did not kill them.[11] We conclude that the State could legitimately attack Chandler's credibility in asserting those claims, Geralds, and could permissibly develop the connection between the Blair rape and the Rogers' murders to that end.
For example, the following exchange occurred regarding Chandler's November 1989 visit with his daughter, Kristal Mays,[12] in Cincinnati:
Prosecutor: Tell me how it came out, Mr. Chandler.
Chandler: I went to the motel, checked in, give her a call. They stopped up, started talking with Rick about building money up. I needed some cash. Said all he had was two ounces of cocaine he could front me. I said, that's fine. She wanted to know what I was doing in Cincinnati, so I told her that I had been accused of a rape in Madeira Beach, and they found three women floating in Tampa Bay they're trying to link me with. That was it.
Prosecutor: Did you tell her you were innocent of both crimes?
Chandler: Did I tell her that I was innocent?

Prosecutor: Yeah.
Chandler: Most certainly did. She never went to no bathroom. She never left the *197 room.[13]
(Emphasis added.) Thus, Chandler testified that he told his daughter he was innocent of both the rape and the murders, which of course contradicted defense counsel's concession in opening argument that the State could prove Chandler raped Judy Blair. Therefore, this was a legitimate subject of inquiry for the State in cross-examining Chandler as it attempted to cast doubt on his defense and undermine his credibility as a witness. § 90.612(2), Fla. Stat. (1993).
Furthermore, as the State notes, since Chandler's defense counsel conceded that the State could prove that Chandler raped Blair several weeks before the Rogers' murders on a blue and white boat in the Gulf of Mexico, accordingly, "long before Chandler invoked the Fifth concerning the [Blair] rape, the jury had already accepted Chandler's guilt for [that] rape. Therefore, any inference of guilt for the [Blair] rape from the invocation of the Fifth is undeniably harmless." Appellee's Answer Brief at 73. Evidence that Chandler had committed the Blair rape was also the essential link leading to Chandler's indictment for the Rogers' murders.[14]
In the final analysis, Chandler knew before he testified that under the ground rules established by the trial judge, the State could permissibly cross-examine him about the Blair rape and he could invoke his Fifth Amendment right against self-incrimination. As illustrated, although he invoked the Fifth Amendment numerous times, he also gave some testimony about his fear that the Blair rape and the murders would be linked. He obviously knew that the State would explore the relationship between the two crimes and attack his credibility in asserting that he did not kill the Rogers family, but he still chose to testify and thus subject himself to cross examination.[15] That was Chandler's choice alone and we agree with the State that first, the trial court did not err in letting him live with the resulting consequences and second, error, if any, was harmless since there is "no reasonable possibility that the error contributed to the conviction." State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986).

Prior Consistent Statement
Next, Chandler argues that the trial court erred in admitting Kristal Mays' prior consistent statement made on October 6, 1992, when the existence of a fact giving rise to a motive to falsify, the October 1990 drug money theft, occurred before the statement was made. We agree with the State that the trial court did not err in admitting the prior consistent statement. We also find any potential error harmless.
We have long held that prior consistent statements "are generally inadmissible to corroborate or bolster a witness' trial testimony." Rodriguez v. State, 609 So.2d 493, 499 (Fla.1992); Jackson v. State, 498 So.2d 906, 909 (Fla.1986); Parker v. State, 476 So.2d 134, 137 (Fla.1985); Van Gallon v. State, 50 So.2d 882 (Fla.1951). Since such statements are usually hearsay, "they are inadmissible as substantive evidence unless they qualify under an exception to the rule excluding hearsay." Rodriguez, 609 So.2d at 500 (citing Charles W. Ehrhardt, Florida Evidence, § 801.8 (1992 ed.)). However, prior consistent statements are considered nonhearsay if the following conditions are met: the person who made the prior consistent *198 statement testifies at trial and is subject to cross-examination concerning that statement; and the statement is offered to "rebut an express or implied charge ... of improper influence, motive, or recent fabrication." Rodriguez, 609 So.2d at 500 (quoting section 90.801(2)(b), Florida Statutes (1989)).
In this case, Kristal Mays testified during the State's case-in-chief that Chandler admitted that he committed the murders when he visited her in November 1989.[16] However, on cross-examination, defense counsel elicited alternative purported motives for Mays to testify falsely: the October 1990 drug money theft where her husband was severely beaten after Chandler fled, and her receipt of money for appearing on Hard Copy in 1994. On redirect, the State attempted to rehabilitate Mays by introducing her sworn statement made to the state attorney's office on October 6, 1992, before the Hard Copy appearance was negotiated. Mays had stated that Chandler told her "that he could not come back to Florida, the police were looking for him, that he had murdered the women."
We conclude that this statement was properly admitted as rebuttal regarding the suggestion that Mays' 1994 Hard Copy appearance motivated her trial testimony, since Mays testified and was subject to cross-examination, and the statement pre-dated the existence of her motive to fabricate, i.e., the Hard Copy appearance. See § 90.801(2)(b), Fla. Stat. (1993). The October 1992 statement was undisputedly made after the October 1990 drug money incident. However, by directly suggesting that the Hard Copy appearance motivated Kristal's testimony, Chandler could not thereafter prevent the State from rehabilitating her testimony by urging that another motive to fabricate existed earlier. That was a choice that the defendant made in urging more than one reason to fabricate at trial. Having made this choice, he must suffer its natural consequences.
The improper admission of prior consistent statements is also subject to harmless error analysis. Anderson v. State, 574 So.2d 87, 93 (Fla.1991). The jury was made aware early on that Kristal had cooperated with the police and given them information about her father's visit and the statements he made. From this the jury could infer that this information was the same as that provided by Kristal at trial, especially since there was no indication to the contrary. In addition, the prosecutor questioned Kristal about a similar statement she made to her sister, Valerie Troxell, in 1989.[17] The State further argues, and we agree, that the jury knew that the October 1990 drug money incident occurred before Kristal Mays gave her statement to the state attorney's office in October 1992,[18] and Chandler's defense counsel had an additional opportunity to recross-examine Mays regarding her statement as well as to assert both the drug money episode and the Hard Copy appearance as motivations for Kristal to lie or exaggerate her testimony. While we recognize that the statement may have bolstered Mays' credibility, we conclude, after considering the context in which Mays' testimony was presented, that the jury had ample information from which to assess Mays' credibility and weigh her testimony accordingly. Therefore, we also find that *199 any error is harmless beyond a reasonable doubt. DiGuilio, 491 So.2d at 1135.

Waiver of Right to Present Mitigating Testimony
As his first penalty phase issue, Chandler contends that the trial court erred in accepting his waiver of the right to present penalty phase mitigating testimony because defense counsel failed to inform the trial court "what that evidence would be," contrary to the procedure we established in Koon v. Dugger, 619 So.2d 246 (Fla.1993). For that reason, Chandler asks us to vacate his death sentences. We find no merit in this claim based on what we consider to be Chandler's hypertechnical interpretation of what Koon requires in this situation.
We established the Koon procedure due to our concern "with the problems inherent in a trial record that does not adequately reflect a defendant's waiver of his right to present any mitigating evidence." 619 So.2d at 250. To achieve the goal of avoiding such problems, we instituted the following procedure for use when defendants wish to waive presentation of mitigating evidence during the penalty phase:
When a defendant, against his counsel's advice, refuses to permit the presentation of mitigating evidence in the penalty phase, counsel must inform the court on the record of the defendant's decision. Counsel must indicate whether, based on his investigation, he reasonably believes there to be mitigating evidence that could be presented and what that evidence would be. The court should then require the defendant to confirm on the record that his counsel has discussed these matters with him, and despite counsel's recommendation, he wishes to waive presentation of penalty phase evidence.
Id. Obviously, our primary reason for requiring this procedure was to ensure that a defendant understood the importance of presenting mitigating testimony, discussed these issues with counsel, and confirmed in open court that he or she wished to waive presentation of mitigating evidence. Only then could the trial court, and this Court, be assured that the defendant knowingly, intelligently, and voluntarily waived this substantial and important right to show the jury why the death penalty should not be imposed in his or her particular case.
The record reflects that after defense counsel informed the court of Chandler's decision and began to go over the list of penalty phase witnesses and what they would say, the trial judge stated:
However, I think there is a caseand I don't have it at my fingertipsbut what it says is, if the Defendant has told the defense counsel not to call relevant mitigation, that defense counsel is, Number One, obligated to tell the Court that; and, Number Two, the Court then is obligated to tell you what you would havewho you would have called and what they would have said, basically.
And then Mr. Chandler has got to, in essence, acknowledge that he understands it could have been helpful and, in essence, announce that he wish that not be presented.
Clearly, the trial judge was describing Koon and the compulsory procedure in this situation.
Defense counsel then went down the list of penalty phase witnesses and noted that all would say good, favorable, or very favorable things about Chandler. He also responded that he had discussed those favorable things with Chandler. At that point, the trial judge commented as follows:
Court: Okay. Mr. Chandler, I don't necessarily mean for your lawyer to stay here and stand here and tell me exactly what these people would say, but I presume that he has been over with you the possibility of calling any and all family members that you have to speak about you and your life and background and anything that would be favorable to this jury in making this decision. Has he gone over that with you?
Chandler: Yes, he has, and I have made a decision, your Honor, to call no one.
Court: And do you understand, sir, that I am obliged to tell you by law that this could be a mistake because these people could very well put some favorable information before this jury to persuade them *200 to recommend a life sentence, as opposed to a death sentence? Do you understand that?
Chandler: Yes, I do.
Court: And you've had plenty of time to talk this over with your lawyer?
Chandler: Yes.
Court: And it is your decision that you have instructed your lawyer not to call these people. Is that correct?
Chandler: That's correct.
Court: Is there anything else we need to put on the record?
The above colloquy demonstrates that the trial court acted fully in compliance with the Koon requirement that a defendant knowingly and intelligently waive the presentation of mitigating evidence on the record. Moreover, we find that defense counsel complied with his duties under Koon by investigating Chandler's background, having witnesses ready and available to testify, and adequately outlining the favorable character evidence that Chandler's witnesses would have presented.[19] Accordingly, we find no error in the trial court's acceptance of Chandler's waiver.

Childhood Trauma as Nonstatutory Mitigation
As his next claim, Chandler alleges that the trial court erred in not finding his purported childhood trauma as nonstatutory mitigation. We find no merit in this claim.
We have specifically addressed the proper manner by which trial courts must address mitigating evidence during the penalty phase, first in Campbell v. State, 571 So.2d 415 (Fla.1990), and most recently in Ferrell v. State, 653 So.2d 367 (Fla.1995). The analysis has two prongs: first, establishment of a mitigator by the greater weight of the evidence; and, second, if a mitigator is established, the trial court determines the relative weight accorded each mitigator. Chandler's claim of error addresses the first prong. Id. at 371.
The approved procedure is as follows:
The sentencing judge must expressly evaluate in his or her sentencing order each statutory and non-statutory mitigating circumstance proposed by the defendant. This evaluation must determine if the statutory mitigating circumstance is supported by the evidence and if the non-statutory mitigating circumstance is truly of a mitigating nature. A mitigator is supported by evidence if it is mitigating in nature and reasonably established by the greater weight of the evidence.
Id. Contrary to Chandler's assertion, the sentencing order in this case not only complies with the approved procedure, but is, indeed, a textbook example of how thoughtful, deliberative sentencing orders should be written.
Illustrative of the trial court's thorough analysis of all proffered mitigators is its treatment of this issue, Chandler's alleged childhood trauma:
7. The Defendant was only ten years old when his father committed suicide.
It is a mitigating factor if a Defendant has had a deprived childhood, or has suffered abuse as a child, or other matters such as this. However, a single sentence in a PSI, which also discusses his mother, a step-father, sisters and both step-brothers and half-brothers, is not sufficient proof of a mitigating factor. The Defendant lived with his mother after his father died. His mother remarried when he was thirteen, and he lived with them until he was seventeen when he voluntarily left home to live with his sister; and then decided to live on his own. (This information is contained in the 1977 PSI).
If child abuse or deprived childhood existed in Defendant's case, he voluntarily elected not to present any evidence of it. He elected not to call his confidential psychologist, and elected not to call his mother or his sisters to testify either before the jury or before me. Surely they could have *201 told us of the Defendant's childhood and the effect, if any, of his father's suicide on the Defendant.
There is no proof, therefore, in the record, of the mitigating factor of child abuse, or a deprived childhood.
(Emphasis added.) The trial court's analysis conforms with the requirements we established in Campbell and Ferrell.
Beyond the trial court's procedural compliance with the guidelines for evaluating mitigating circumstances, we have recognized that it is within the trial court's discretion to determine whether such mitigation has been established. Foster v. State, 679 So.2d 747, 755 (Fla.1996), cert. denied, ___ U.S. ___, 117 S.Ct. 1259, 137 L.Ed.2d 338 (1997); Preston v. State, 607 So.2d 404 (Fla.1992); Sireci v. State, 587 So.2d 450 (Fla.1991); Stano v. State, 460 So.2d 890 (Fla.1984). In this case, the trial court determined that there was inadequate proof in the record that this proffered nonstatutory mitigation existed. This is the process required by Campbell and Ferrell.

HAC Standard Jury Instruction
As his last penalty phase issue, Chandler argues that the standard jury instruction on the "heinous, atrocious, or cruel" (HAC) aggravating circumstance is unconstitutionally vague.
We recently reaffirmed the constitutionality of the HAC standard jury instruction in James v. State, 695 So.2d 1229, 1235 (Fla.), petition for cert. filed, No. 97-6104 (U.S. Sept. 18, 1997). In James, we rejected the appellant's vagueness and overbreadth challenges since the HAC instruction given at trial was the same instruction approved in Hall v. State, 614 So.2d 473 (Fla.1993), wherein this Court found that neither the instruction nor the aggravator itself was unconstitutionally vague. James, 695 So.2d at 1235; Hartley v. State, 686 So.2d 1316 (Fla. 1996), cert. denied, ___ U.S. ___, 118 S.Ct. 86, ___ L.Ed.2d ___ (1997). Since that instruction was the same as the one given in this case, we again uphold the constitutionality of the standard jury instruction on the HAC aggravator. James; Hartley.

Proportionality
Finally, although neither party raises the issue of proportionality, review of our prior case law reveals that the death sentences in this case are proportionate to other cases where sentences of death have been imposed. See Rolling v. State, 695 So.2d 278 (Fla.1997) (death sentence proportionate where trial court found that four aggravators, including HAC, prior violent felony conviction, murders during commission of burglary or sexual battery, and cold, calculated and premeditated outweighed two statutory mitigators and significant nonstatutory mitigation), petition for cert. filed, No. 97-5975 (U.S. Sept. 10, 1997); Henyard v. State, 689 So.2d 239 (Fla.1996) (finding four aggravators, including HAC, prior violent felony conviction, and murder during commission of kidnapping and sexual battery outweighed two statutory mitigators and minor nonstatutory mitigation), cert. denied, ___ U.S. ___, 118 S.Ct. 130, ___ L.Ed.2d ___ (1997); Marshall v. State, 604 So.2d 799 (Fla.1992) (affirming death sentence where four strong aggravators, including HAC, prior violent felony convictions, and murder during commission of burglary outweighed minor mitigation).

CONCLUSION
In summary, we affirm Chandler's firstdegree murder convictions and sentences of death.
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW, GRIMES, HARDING, WELLS and ANSTEAD, JJ., concur.
NOTES
[1] When the Coast Guard recovered Christe's body, they had to cut the rope around her neck since they could not dislodge or pull up the heavy object at the end of the rope.
[2] Soraya Butler, Elizabeth Beiro, Carl Voeller, and Frances Watkins.
[3] The trial court found the following statutory aggravators: (1) the defendant has been convicted of prior violent and capital felonies, section 921.141(5)(b), Florida Statutes (1993); (2) the murders were committed during the commission of a kidnapping, section 921.141 (5)(d); (3) the murders were committed to avoid arrest, section 921.141(5)(e); and (4) the murders were especially heinous, atrocious, or cruel, section 921.141(5)(h). No statutory mitigators were presented or proved. Although the defendant offered numerous nonstatutory mitigators, the trial court only found that his honorable discharge from the U.S. Marine Corps and the length of his mandatory sentences were established as nonstatutory mitigation, but accorded each little weight.
[4] The claims are: (1) the trial court violated Chandler's constitutional right to a fair trial by admitting evidence that he sexually battered Judy Blair; (2) the trial court erred in requiring Chandler to repeatedly invoke his right to remain silent before the jury; (3) the trial court erred in allowing the State to present a prior consistent statement by Kristal Mays; (4) the prosecutor's closing argument violated Chandler's right to a fair trial; (5) the trial court erred in accepting Chandler's waiver of his right to present mitigating testimony during the penalty phase; (6) the trial court erred in rejecting Chandler's claim of childhood trauma as a mitigating circumstance; and (7) the standard jury instruction for the heinous, atrocious, or cruel aggravating circumstance is unconstitutionally vague.
[5] The prosecutor's comment that Chandler never told his daughters or son-in-law that he was innocent was a fair characterization of the evidence, while his other comments about Chandler and his counsel were thoughtless and petty, e.g., counsel engaged in "cowardly" and "despicable" conduct and Chandler was "malevolent ... a brutal rapist and conscienceless murderer," but not so prejudicial as to vitiate the entire trial. Esty v. State, 642 So.2d 1074, 1079 (Fla. 1994); Bertolotti v. State, 476 So.2d 130 (Fla. 1985).
[6] To support his argument, Chandler directs our attention to Drake v. State, 400 So.2d 1217 (Fla. 1981); Thompson v. State, 494 So.2d 203 (Fla. 1986); and Peek v. State, 488 So.2d 52 (Fla. 1986), wherein we found that the prior sexual crimes of the defendants in those cases were inadmissible in their murder prosecutions since the collateral crimes were insufficiently similar. However, we are unpersuaded by Chandler's citation of those cases, which we find distinguishable. For example, the only similarity between the crimes in Drake was that the victims' hands were tied behind their backs and they had left a bar with the defendant. 400 So.2d at 1219. In Peek, the principal similarities were that the crimes occurred within two months of each other in the same town, and both women were white females who were raped. 488 So.2d at 55. In Thompson, the primary similarities were that both victims were approximately the same age and build; both crimes occurred near a particular church parking lot; and the defendant was having domestic problems on both occasions. 494 So.2d at 204. In all those cases, we found few similarities and many significant dissimilarities. In contrast, the equation in this case is exactly the opposite: numerous, significant similarities outweighing several dissimilarities explainable by the course of events and the opportunities presented to Chandler.
[7] On this factor, the trial judge wrote as follows:

Without Judy Blair and Barbara Mottram's testimony, what jury could possibly believe [that] Mrs. Rogers and her two children would board Chandler's boat for a sunset cruise within 24 hours of having met him? This was a critical question the State had to answer at trial. The Blair incident was relevant and necessary to answer that question. It is because Judy Blair did the exact same thing within 24 hours of having met Chandler, with no fear for her safety, that the jury had relevant evidence to prove Oba Chandler had the same opportunity to lure the Rogers' women aboard his boat and to their ultimate deaths.
[8] This request was made before Chandler testified on direct examination and thus, obviously, before the State cross-examined him.
[9] In denying Chandler's request for a standing objection, the trial judge stated:

No way do I want to prohibit Mr. Chandler from testifying before this jury. No way do I want to prohibit the State from cross-examining Mr. Chandler about matters that I have ruled are relevant to this case. That puts Mr. Chandler in a tough dilemma. That really isn't my concern. That's your concern and Mr. Chandler's concern....
[To defense counsel]: You knew how the court was going to rule. We went over this last night with everybody present. I'm sure you talked to your client after that. Certainly [it] cannot come as a surprise to you or your client.
This is exactly what I said last night. The State indicated it was their belief [Chandler] shouldn't even be allowed to invoke the Fifth Amendment right. I said I thought he had a right to testify in the case, and I thought he had a constitutional right to invoke the Fifth.
He does want to testify or doesn't?
Defense counsel: One second, please. He is going to testify.
(Emphasis added.)
[10] Midway through Chandler's direct testimony, the following exchange occurred:

Defense counsel: Now, did you see [the Rogers family] again at any time that day?
Chandler: I've never seen them again.
Defense counsel: Never saw them again in your life?
Chandler: No, sir.
Defense counsel: Did you kill these people?
Chandler: No, I did not.
Defense counsel: Did you take them out on your boat?
Chandler: No, they've never been on my boat.
[11] As his final question on direct exam, Chandler's attorney asked him: "Did you kill these ladies?" Chandler responded that "I have never killed no one in my whole life. I have never its's ludicrous. It's ridiculous."
[12] Mays had testified to these issues during the State's case-in-chief.
[13] This exchange also shows that Chandler did answer some questions about the Blair rape, while invoking the Fifth Amendment on others. The trial judge pointed this out to defense counsel when he renewed his request for a standing objection.
[14] As the State points out, "Chandler was apprehended and identified as the same person whose handwriting and palmprint were on the brochure in the Rogers' car" based on a composite drawing made by Judy Blair. Appellee's Answer Brief at 45. Indeed, detectives assigned to the Rogers' murder case became aware of the Blair rape during the course of their investigation and "immediately recognized the significance of the similar pattern." Id.
[15] At a sidebar conference at the end of his cross-exam of Chandler, the prosecutor stated:

Just for the record, since I've been repeatedly maligned by the accusations that I was causing Chandler to invoke the Fifth Amendment, I want to clarify that he has a Fifth Amendment right. I wanted answers to my questions. That is what I would prefer. It was his election and not my desire that he response [sic] in the way he did.
[16] Kristal testified on direct examination:

And then he said that he couldn't go back to Florida because the police were looking for him because he killed some women....
Prosecutor: He indicated he had killed women?
Kristal: Yes.
Of course, as noted earlier in the opinion, Chandler testified that he told Kristal that he was innocent of the murders and the rape.
[17] Kristal testified that after her father left Cincinnati, she discussed their conversation with Valerie. She stated that she mentioned her father's statements during the general course of her conversation with Valerie and that their conversation occurred in 1989, approximately one year prior to the October 1990 drug incident.
[18] On cross-examination, defense counsel explored this issue extensively, asking Kristal Mays numerous questions about the events surrounding the drug money theft, the fact that she told her husband to report Chandler to the police because he "put a gun" on him, and her later taping of her conversations with her father in cooperation with the police. Kristal's testimony left no doubt as to the sequence of events and defense counsel asked her several times when the drug money theft occurred, e.g., "[t]his incident occurred in October of 1990, right?", to which Kristal responded "yes."
[19] Thus we reject Chandler's contention that since defense counsel did not go into greater detail about "what that favorable evidence would be," we should vacate his sentences and thereby ignore the fact that the core requirement of Koonknowing, intelligent, and voluntary waiver in open courtwas clearly met in this case.