746 So.2d 423 (1998)
Thomas KNIGHT, n/k/a Askari Abdullah Muhammad, Appellant,
v.
STATE of Florida, Appellee.
No. 87,783.
Supreme Court of Florida.
November 12, 1998.
Rehearing Denied March 11, 1999.
*426 Bennett H. Brummer, Public Defender, and Louis Campbell, Assistant Public Defender, Eleventh Judicial Circuit, Miami, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Fariba N. Komeily, Assistant Attorney General, Miami, Florida, for Appellee.
PER CURIAM.
We have on appeal the sentences of the trial court imposing the death penalty on resentencing upon appellant Thomas Knight, n/k/a Askari Abdullah Muhammad. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm the imposition of the death sentences.

PROCEDURAL HISTORY
This case is a direct appeal from a resentencing proceeding, wherein the jury recommended two death sentences by a vote of nine to three. The trial judge accepted the jury's recommendation and imposed the death sentences on February 20, 1996.[1] The resentencing proceeding had been ordered by a federal appeals court on the basis of an error under Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987) (requiring trial courts to consider non-statutory, as well as statutory, mitigating evidence proffered by a capital defendant). Knight v. Dugger, 863 F.2d 705 (11th Cir.1988).
Knight was convicted of the murders of Sydney and Lillian Gans and was sentenced to death. We affirmed his convictions and sentences on direct appeal. Knight v. State, 338 So.2d 201 (Fla.1976). Knight's subsequent habeas petition was dismissed by the trial court. Knight also fatally stabbed a prison guard, Officer James Burke, in his cell on death row on October 12, 1980, and was convicted and sentenced to death for that crime. This *427 Court affirmed both the conviction and the sentence on direct appeal. Muhammad v. State, 494 So.2d 969 (Fla.1986). In his subsequent appeal of the trial court's denial of his 3.850 motion, this Court reversed the summary denial of Knight's Brady[2] claim and remanded for an evidentiary hearing on that issue alone. Muhammad v. State, 603 So.2d 488 (Fla.1992).
Subsequently, we rejected Knight's contention that he had received ineffective assistance of appellate counsel on direct appeal of his convictions for the Gans' murders. Knight v. State, 394 So.2d 997 (Fla.1981). After the Governor signed a death warrant for the Gans' murders, Knight filed a habeas petition and a motion for stay of execution in the federal district court. The district court granted the motion, retained jurisdiction over the petition, and ordered Knight to exhaust his alleged remaining state law claims.
Knight then filed a 3.850 motion in state court, which was denied, and on appeal the denial was affirmed. Muhammad v. State, 426 So.2d 533 (Fla.1982). Knight then resumed prosecution of his federal petition, and, after the trial court dismissed Knight's petition, the Eleventh Circuit affirmed on six of the seven issues presented, but reversed on the Hitchcock issue.[3] The resentencing proceeding now being reviewed was mandated by that decision.

MATERIAL FACTS
On direct appeal, we related the following material facts:
Upon arriving at his place of business and parking in his designated space, Mr. Gans was approached by the defendant who was carrying an automatic rifle and was told to re-enter his automobile, to drive home and get Mrs. Gans, and to drive to the bank and get $50,000. While inside the bank, Mr. Gans informed the president about the abduction. The police and FBI were alerted. Mr. Gans then returned to his car with the money. He and his wife, shortly thereafter, were found shot to death, the fatal shotsperforating through their neckshaving been fired from the rear seat of the vehicle. Thereafter, Knight was apprehended and taken into custody in a weeded area about 2,000 feet from the Gans' vehicle. Underneath him buried in the dirt was an automatic rifle and a paper bag containing $50,000. There were blood stains on his pants.
Knight, 338 So.2d at 202. During the resentencing hearing, FBI Agent Terry Nelson testified that he was involved in all stages of the surveillance of the criminal episode. He arrived at City National Bank in an unmarked car, and observed the Gans' Mercedes, with Mrs. Gans driving and a black male with a rifle across his lap sitting in the right rear. After Mr. Gans returned to the car, the vehicle departed and followed a circuitous route before heading toward an unpopulated area of south Dade County.
Nelson momentarily lost sight of the Mercedes, and after regaining contact, Nelson again lost sight of the Mercedes as it proceeded along a canal ridge. When Nelson exited his vehicle for a better view, he received a radio call that two individuals had been shot and a black male was seen running into the woods nearby. The surveillance lasted for approximately an hour and covered about twenty miles. Nelson testified that Knight took no actions indicating he was aware of the surveillance.[4] The FBI and Dade County police vehicles participating were unmarked and none of the officers were in uniform. *428 One STOL[5] aircraft and a helicopter were also involved in parts of the surveillance.
Dr. Joseph Davis, the original medical examiner, testified that Mrs. Gans was killed instantly from a bullet which entered the back right side of her neck and exited her left cheek. Mr. Gans was shot in the lower right side of the face, with the bullet having exited his jaw. His wound had stippling or gunpowder marks burnt into the flesh, indicating that he had been shot at point-blank range. Mr. Gans was found in the underbrush, a trail of blood indicating that he had been dragged out and away from the vehicle after being shot.
Detective Greg Smith testified that he was a member of the cold-case squad, having been assigned to the case in 1989 because the former lead detective, Detective Ojeda, had retired from the police department. Smith reviewed the trial testimony and reports of witnesses who were no longer available. Smith recounted to the judge and jury the testimony of the deceased Gans' company comptroller, Milton Marinek, the testimony of Detective Ojeda and, in rebuttal testimony, the sworn statement of the helicopter pilot, as well as relating the physical evidence presented at trial.
Numerous witnesses testified on Knight's behalf. They presented testimony that Knight, the second oldest of nine children, came from a family with a history of mental illness and neurological problems. Knight's sisters Mary Ann, Doris, and Edna, as well as Deputy Patrick Duval, detailed the poverty, hunger, and brutal beatings Knight had sustained during his childhood in Fort Pierce. Knight's father was an alcoholic who had stopped providing for his family in 1960. Knight's father beat him often and with brutality. The Knight children often went without food or clothing. In June 1960, Knight's father raped Knight's sister Mary Ann. Knight, nine years old at the time, either witnessed his sister's rape and tried to stop it, or was told about it by Mary Ann immediately thereafter.
Knight was first arrested at age nine for theft. When he was arrested on the same charge several months later, he was committed to the Florida School for Boys, the youngest child ever sent there. He was continually in trouble thereafter, until at age fifteen he was sent to state prison on a burglary conviction. At age nineteen, he was committed to the Northeast Florida State Hospital where he was diagnosed with drug and poison intoxication, excessive drinking, and paranoid personality.
Numerous mental health experts testified to Knight's longstanding mental problems. Dr. Brad Fisher, a forensic psychologist, opined that Knight was a chronic schizophrenic. He testified that Knight was acting under an extreme mental or emotional disturbance at the time of the murders and that his ability to appreciate the criminality of his conduct was substantially impaired. Dr. Joyce Carbonell, a clinical psychologist, testified that Knight was a schizophrenic and that the statutory mental mitigators were manifested at the time of the murders. Dr. Thomas McLaine, a psychiatrist, testified that he evaluated Knight in 1991, concluding that he fell "somewhere between the severe personality disorder and the schizophrenic." He also opined that at the time of the killings, Knight was under the influence of an extreme mental or emotional disturbance and that his ability to conform his conduct to the requirements of the law was "somewhat impaired all the time and [has] been for most of his 45 years." Dr. Jethro Toomer, a psychologist, opined that the statutory mental mitigators applied at the time of the murders. Dr. David Rothenberg, a clinical psychologist, testified that Knight was a chronic paranoid schizophrenic. Dr. William Corwin, a psychiatrist, *429 stated that Knight was argumentative, evasive, hostile, angry and that "there was some conscious exaggeration of his symptoms with a tendency to present himself as being actually ill." Dr. Arthur Wells, a psychologist, testified that when Knight committed the murders, he was "50 percent or more out of control, had no ability to reason, to judge what he was doing."
In rebuttal, the State called Dr. Eileen Fennell, a neuro-psychologist. She testified that Knight has a paranoid personality disorder, but is a malingerer who does not suffer from paranoid schizophrenia. Dr. Lloyd Miller, a forensic psychologist, likewise testified that Knight is a malingerer who does not have any major mental illnesses. Similarly, Dr. Charles Mutter, a forensic psychiatrist, found Knight to have a paranoid and antisocial personality, but no major mental illness.
Finally, Detective Smith was recalled on rebuttal and testified that his review of the prior testimony confirmed that no uniformed officers or marked vehicles were involved in the surveillance. Moreover, he testified that the STOL pilot's prior sworn testimony reflected that the pilot first saw the Mercedes after it had stopped and Knight was fleeing and that the helicopter pilot's prior sworn statement confirmed that observation.
As noted above, the jury recommended a death sentence for both murders and the judge agreed.

APPEAL
Knight raises seventeen claims of error on appeal,[6] several of which we resolve summarily.[7] We address the remaining issues in turn.

DETECTIVE SMITH'S TESTIMONY
In his first claim, Knight contends that Detective Smith's hearsay testimony violated his right to confrontation, due process, *430 and a reliable sentencing proceeding. The gravamen of Knight's claim is that Detective Smith's recounting, on rebuttal, of the helicopter pilot's prior sworn statement violated his Confrontation Clause right to confront and cross-examine witnesses because, unlike Smith's earlier testimony summarizing prior trial testimony, the pilot's statement had never been subjected to adversarial testing and lacked the reliability accorded former testimony. However, because Knight never specifically objected to Smith's testifying as to the contents of the pilot's statement, we find this claim procedurally barred.[8]

DETECTIVE SMITH'S PRESENCE IN COURTROOM
Knight next contends that the trial judge erred in granting the State's motion to allow Detective Smith to remain in the courtroom throughout the proceeding.
The purpose of the rule of sequestration is "to avoid a witness coloring his or her testimony by hearing the testimony of another," thereby discouraging "fabrication, inaccuracy and collusion." Charles W. Ehrhardt, Florida Evidence § 616.1, at 506 (1998 ed.). Section 90.616(2)(c), Florida Statutes (1997), allows an exception to the rule of sequestration for "[a] person whose presence is shown by the party's attorney to be essential to the presentation of the party's cause." This exception is applied most commonly to expert witnesses because "experts are testifying to their opinions rather than to factual matters." Ehrhardt, supra § 616.1, at 510. However, as Professor Ehrhardt has noted, in applying this exception to the rule of sequestration, the trial court "has wide discretion in determining which witnesses are essential." Id. at 509.
While recognizing that Detective Smith was a fact witness, we conclude that the trial court did not abuse its discretion in ruling that the theory underlying exceptions to the rule is equally applicable to the unique facts of this case. Smith was testifying as to what others had testified to two decades earlier, or as to what others had stated in sworn statements. Therefore, he was, in a sense, a reporter of what other individuals had long since said under oath in a recorded statement. His testimony was subject to being carefully checked by comparison to the transcripts of the trial testimony. Obviously, the prior statements of the individuals he was standing in for could not change based upon his presence during the testimony of the witnesses who preceded him. See Randolph v. State, 463 So.2d 186, 191 (Fla.1984) (noting that "[t]his is not a situation where the witness who was excluded from the sequestration rule was a principal actor in the crime, nor is this a case where the testimony of the witness was actually suggested by what he heard in the courtroom").[9] Accordingly, Smith's ongoing courtroom presence did not implicate any of the dangers normally implicit when a witness hears other testimony prior to testifying. As such, we conclude that the trial judge acted within his discretion on this issue.

FUTURE DANGEROUSNESS AS A NONSTATUTORY AGGRAVATOR
Knight argues that because a defendant's future dangerousness cannot be *431 used as a nonstatutory aggravating circumstance, the State impermissibly turned expert testimony that he had a longstanding mental illness into a nonstatutory aggravator by eliciting testimony that Knight's illness was almost impossible to cure, that Knight needed heavy structure and medication, and other similar comments. Knight further contends that the prosecutor accentuated this impropriety during closing argument by offering that Knight's own expert witness thought he was dangerous and untreatable and one who would "kill, and kill and kill again" if not executed.
The State correctly notes that none of the instances of alleged impropriety were objected to or argued to the trial court and, therefore, they are procedurally barred. See San Martin v. State, 705 So.2d 1337, 1345 (Fla.1997). Ordinarily, allegedly improper prosecutorial comments not constituting fundamental error are not cognizable on appeal absent a contemporaneous objection. See Urbin v. State, 714 So.2d 411, 418 n. 8 (Fla.1998); Kilgore v. State, 688 So.2d 895, 898 (Fla.1996).[10]

JURY INSTRUCTIONS ON CONSECUTIVE LIFE SENTENCES
Knight argues that because he had already served twenty-two years on death row by the time of resentencing, his parole ineligibility was a critical factor to be weighed with the jury's consideration of other mitigators. He contends that because the jury was aware that he could possibly be eligible for parole within three years if sentenced to concurrent life terms, the judge's withholding of his sentencing intentions if this contingency arose skewed the balancing process in favor of death, thus violating the Eighth Amendment.
As the State points out, we recently rejected a similar claim in Walker v. State, 707 So.2d 300 (Fla.1997). There, as here, the defendant was accused of a double homicide. Likewise, Walker argued to the jury that consecutive life sentences, each without the possibility of parole for twenty-five years, effectively precluded him from ever being released during his natural life. Id. at 314. While Knight correctly identifies the different times when he and Walker made their motions, the fact that both defense counsel and the trial judge informed the jury here that consecutive life sentences totaling a minimum mandatory of fifty years could be imposed was sufficient to fully apprise the jury of the consequences of a life recommendation, and we find no abuse of discretion in the trial court's ruling. We find that reasoning equally applicable irrespective of when the requested sentencing determination is made.

JURY INSTRUCTION ON KNIGHT'S ABSENCE FROM COURTROOM
Knight was removed from the courtroom on a daily basis due to his refusal *432 to remain silent. Nevertheless, Knight contends on appeal that the judge's explanation to the jury that the proceedings were not started on time because he "would not conform to accepted courtroom behavior" was unfairly prejudicial.
Our review of the record reveals that the trial judge bent over backwards to accord Knight his right to be present in the courtroom. Despite rambling monologues and general obstructionist conduct, the trial judge let Knight return to the courtroom every morning for another opportunity to behave properly and remain for the proceeding. However, without exception, Knight daily refused to obey the judge's instruction that he remain silent until the proper time. The judge was remarkably patient, even allowing a lengthy, uninterrupted monologue by Knight on the second day of voir dire, January 24, 1996. Shortly thereafter, Knight was again removed from the courtroom for refusing to obey the judge's instructions. Even then, the judge resolved to give Knight a daily opportunity to act acceptably in court.[11]
Moreover, the judge's actions were consistent with this Court's case law, as well as United States Supreme Court precedent. See Illinois v. Allen, 397 U.S. 337, 343, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) ("The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case."); Valdes v. State, 626 So.2d 1316, 1321 (Fla.1993) (pronouncing that "[t]rial judges must be given sufficient discretion to meet the circumstances of each case where a defendant disrupts the proceedings"); Diaz v. State, 513 So.2d 1045, 1047 (Fla.1987) (applying Allen in finding that the "court's obligation to maintain safety and security in the courtroom outweighs, under proper circumstances, the risk that the security measures may impair the defendant's presumption of innocence"); accord Joseph v. State, 625 So.2d 109 (Fla. 3d DCA 1993). We find no error in the judge's instruction to the jury.
From the record it is apparent that Knight had every opportunity to remain in the courtroom, but chose to misbehave. Indeed, his consistently obstinate behavior, which he undoubtedly knew would cause his exclusion from the courtroom, also borders on invited error. See San Martin v. State, 705 So.2d 1337, 1347 (Fla.1997) (prohibiting party from inviting error and then complaining about it on appeal). Accordingly, we find that the judge acted within his discretion in repeatedly removing Knight from the courtroom, especially considering the testimony of numerous guards and jailhouse officials that Knight's out-of-court demeanor was completely at odds with his in-court histrionics. The judge's explanation to the jury was reasonable because it accurately reflected the obvious ongoing dilemma of the trial court in balancing Knight's rights with the need to maintain proper order and decorum in the courtroom.

DR. MILLER'S TESTIMONY
In his next claim of error, Knight correctly notes that Dr. Lloyd Miller had been twice appointed by the court for the *433 sole purpose of evaluating Knight's competence and each time concluded that he was a malingerer. However, Knight claims that the State improperly called Dr. Miller to testify during its rebuttal case in violation of the confidentiality provision of Florida Rule of Criminal Procedure 3.211, Knight's Fifth Amendment right against self-incrimination, and his Sixth Amendment right to counsel. Knight also asserts that Dr. Miller's testimony was irrelevant and exceeded the proper scope of rebuttal.
At the outset, we agree with the State that Knight never raised the confidentiality provision, Fifth Amendment, or Sixth Amendment issues in the trial court. Therefore, those sub-claims are procedurally barred. See San Martin, 705 So.2d at 1345 (citing Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982), for proposition that "in order for an argument to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection, exception, or motion below").
As to the proper scope of rebuttal, the State persuasively argues that the defense opened the door to Dr. Miller's rebuttal testimony by addressing the issue of Knight's competence and referencing Dr. Miller's competency examination report itself. Appellee's Answer Brief at 57-58. Miller's testimony focused exclusively on the manner in which he conducts competency evaluations in general and some of the questions he asked Knight in particular. Therefore, we can discern no unfair prejudice to Knight from this line of questioning. Accordingly, we find no merit in this claim.

REMOVAL OF JURORS WELDON, ZARIBAF, AND CUNNINGHAM
As his next claim of error, Knight challenges the trial court's removal of jurors Weldon, Zaribaf, and Cunningham because of extrinsic communications with a courthouse employee. For example, juror Cunningham told the trial court that the employee said that Knight was "a total pscyho ... he is in a wheelchair ... [and] he is trying to starve himself to death." Despite asking the employee to cease commenting about the case three times, the employee kept talking and also mentioned that Knight had tried to commit suicide. During individual voir dire after the incident, all of the jurors said they could set it aside and be fair to both parties. However, on the State's motion, the court excused the three jurors on the basis that they now had outside information about Knight. Knight contends that the trial court's ruling violated his right to counsel because he alone was prejudiced by this improper contact, not the State.
We conclude that this incident presented a presumptive instance of prejudice where the jurors heard obviously improper commentary from a courthouse employee relating to Knight's mental health problems. Accordingly, we find no abuse of discretion in the trial court's removal of the three jurors.

PROSECUTOR'S COMMENTS
Knight claims that through comments and questions to defense expert witnesses, the prosecutor placed before the jury irrelevant, highly prejudicial and inflammatory information. However, we agree with the State that this claim is procedurally barred because none of these arguments were raised in the trial court. San Martin, 705 So.2d at 1345.
Even if this issue was properly preserved, we still would find no error. Although one of the cited prosecutor's comments regarding the value of Knight's and victims' lives was clearly improper, see Urbin, 714 So.2d at 420-21, we conclude this isolated instance of misconduct was not egregious enough to warrant voiding of the entire proceeding. See Bertolotti v. State, 476 So.2d 130, 133 (Fla.1985); see also Shellito v. State, 701 So.2d 837, 842 (Fla.1997) (determining that prosecutor's "brief reference to [defendant's] lack of remorse was of minor consequence and constituted harmless error"), cert. denied, *434 523 U.S. 1084, 118 S.Ct. 1537, 140 L.Ed.2d 686 (1998).

JURY INSTRUCTIONS ON MERGING OF AGGRAVATORS
Knight next claims that the trial court erred in refusing to instruct the jury on the merging of aggravators based on a common aspect of the offense. Knight contends that because the jurors could properly conclude that the kidnapping merged with either the HAC, avoid arrest, or pecuniary gain aggravators, the failure to give the merging instruction undermined the reliability of the jury's sentencing recommendation.
We agree with the State that this issue was not preserved below because no such argument regarding these specific grounds was made. Therefore, this claim is procedurally barred. San Martin; Gore v. State, 706 So.2d 1328 (Fla.1997), cert. denied, ___ U.S. ___, 119 S.Ct. 212, 142 L.Ed.2d 174 (1998).

JURY INSTRUCTION ON PRIOR VIOLENT FELONY AGGRAVATOR
Knight claims that the trial court erred in instructing the jury on the prior violent felony aggravator. The State correctly notes that under Elledge v. State, 346 So.2d 998 (Fla.1977), and its progeny, previous violent felony convictions suffice for purposes of the prior violent felony aggravator so long as the convictions predate the sentencing, even when the crimes underlying the conviction occurred after the crime for which the defendant is being sentenced. Moreover, the State is also correct that even if the above analysis was inapplicable, any error would be harmless since each of the contemporaneous murders involved herein qualify as prior violent felony convictions, a rule of law recently reaffirmed by this Court. See Mahn v. State, 714 So.2d 391, 399 (Fla. 1998) (citing Windom v. State, 656 So.2d 432, 440 (Fla.1995)).

JURY INSTRUCTION ON CCP AGGRAVATOR
Knight next asserts that the application of the CCP aggravator to the crimes he committed in 1974 is an ex post facto violation because the legislature did not enact that aggravator until 1979. Knight further contends that both the aggravator and jury instruction are unconstitutionally vague.
As Knight acknowledges, we have previously determined that application of the CCP aggravator in this situation is not an ex post facto violation. Combs v. State, 403 So.2d 418 (Fla.1981). Moreover, the jury instruction given here was the same instruction approved in Jackson v. State, 648 So.2d 85 (Fla.1994), an interim instruction we have repeatedly found constitutional.[12]See, e.g., Walker, 707 So.2d at 316; Bell v. State, 699 So.2d 674, 678 (Fla.1997), cert. denied, 522 U.S. 1123, 118 S.Ct. 1067, 140 L.Ed.2d 127 (1998).

REQUESTED JURY INSTRUCTION ON STATUTORY MENTAL MITIGATORS
Knight argues that the trial court's refusal to give expanded jury instructions on statutory mental mitigators was error because, among other things, Dr. Mutter suggested that to qualify as mitigating, a mental disturbance must be such that Knight did not know right from wrong. We find no error in the trial court's refusal to issue the expanded instructions.
This Court has repeatedly upheld the Florida standard jury instructions on mitigators, without requiring more. Walls v. State, 641 So.2d 381, 389 (Fla.1994). Accordingly, we affirm the trial court's ruling on this issue.

IMPOSITION OF DEATH SENTENCE
Knight challenges the evidentiary basis of the trial court's imposition of *435 death in this case. He contends that the trial court improperly weighed the proffered mitigation and erroneously found six aggravators.
The trial judge's lengthy and detailed sentencing order, replete with citations to the record and case law, is a comprehensive evaluation of all the salient weighing factors. The trial judge specified the sometimes conflicting evidence presented, analyzed the evidentiary basis of the proposed aggravators, evaluated the proffered mitigators and weighed those he found established. He further assessed the credibility of the expert witnesses, assigned weight to the expert opinions, and ruled accordingly. Consequently, Knight is hard pressed to show that the trial court erred in carrying out its responsibility to carefully consider each of the relevant aggravators and mitigators and assign proportionate weight to each.

AGGRAVATORS
As to the aggravators, the trial court's sentencing order details the evidence in support of the aggravators it found. As demonstrated above in our discussion on another issue, there really is no debate as to the validity of the prior violent felony aggravator. Likewise, the evidence outlined above supports the judge's finding that the murders were committed for pecuniary gain, especially the fact that even in flight, Knight still had the presence of mind to retain the paper bag containing $50,000. Similarly, there can be little doubt that the murders were committed during the commission of a kidnapping. Further, as noted in the judge's sentencing order, Knight did not challenge the applicability of this aggravator in his sentencing memorandum to the court. Hence, the finding as to three statutory aggravators is virtually undisputed.

AVOID ARREST
As we have recently reaffirmed, to support a valid avoid arrest aggravator where the victim is not a law enforcement officer, "the proof must demonstrate beyond a reasonable doubt that the victim was murdered solely or predominantly for the purpose of witness elimination." Urbin, 714 So.2d at 416. In finding that the State had met that burden in this case, the trial court observed:
Had the sole motive for the murders been financial gain, the defendant's purpose would have been accomplished upon the receipt of the money. Even if he had wanted to perfect his get-away he could have taken the car after he asked the Ganses to exit the vehicle and driven away. His actions clearly indicate however that he ordered them back into the car, told them to drive to an even more secluded area and executed them.
Obviously, Knight had some purpose in mind, regardless of the state of his mental faculties, in killing the victims execution style at the end of his rambling journey to a remote location. We conclude that although the issue may be contested, there is sufficient evidence, including circumstantial evidence, to support the trial court's finding. Hence, we affirm the trial court's finding of the avoid arrest aggravator. Urbin.

HAC
However, as to HAC, we conclude that the trial court's description of the victims' ordeal during the time they were being abducted up to and including the time they were murdered was largely based upon conjecture and speculation. While the trial court's speculation as to what took place may well have occurred, there simply is no evidence in the record to fill in this void in the tragic episode or to rule out other possible scenarios. There simply is no evidence of what took place between the victims and Knight during the trip in the automobile before the execution-style killings took place. Hence, we conclude that the trial court erred in finding this aggravator. However, we find *436 the error harmless in view of the finding of five other valid aggravators.

CCP
Finally, as to CCP, the trial court cited evidence to support a finding as to all elements of that aggravator. Even if Knight did not make the final decision to execute the two victims until sometime during his lengthy journey to his final destination, that journey provided an abundance of time for Knight to coldly and calmly decide to kill. Based on our own review of the evidence in the record, we affirm the trial court's finding of this aggravator.

MITIGATION
As to mitigation, in Chandler v. State, 702 So.2d 186 (Fla.1997), we reiterated the approved procedure by which trial courts must address such proffered evidence:
The sentencing judge must expressly evaluate in his or her sentencing order each statutory and non-statutory mitigating circumstance proposed by the defendant. This evaluation must determine if the statutory mitigating circumstance is supported by the evidence and if the non-statutory mitigating circumstance is truly of a mitigating nature. A mitigator is supported by evidence if it is mitigating in nature and reasonably established by the greater weight of the evidence.
Id. at 200 (quoting Ferrell v. State, 653 So.2d 367, 371 (Fla.1995)). As a general matter, if the trial court conducts the proper inquiry, see Walker, 707 So.2d at 319 (directing trial courts to conduct "a thoughtful and comprehensive analysis of any evidence that mitigates against the imposition of the death penalty"), it is within its power to determine whether mitigating circumstances have been established by a preponderance of the evidence. Foster v. State, 679 So.2d 747, 755 (Fla. 1996). On the discrete issue of expert psychological evaluations of a defendant's mental health, "expert testimony alone does not require a finding of extreme mental or emotional disturbance. Even uncontroverted opinion testimony can be rejected, especially when it is hard to reconcile with the other evidence presented in the case." Id. at 755 (citation omitted); see also Walls, 641 So.2d at 390-91 (reasoning that opinion testimony "gains its greatest force to the degree it is supported by the facts at hand, and its weight diminishes to the degree such support is lacking").
In this case, the trial judge spent over twenty pages evaluating Knight's proffered mitigators. The judge resolved the conflicts in the evidence regarding the statutory mental mitigators against Knight, finding the State's expert witnesses more credible and compelling. Consequently, after devoting nine pages in analyzing the often contradictory expert testimony, the judge found that the statutory mental mitigators had not been established. As underscored in Chandler, this is the process required by Campbell v. State, 571 So.2d 415 (Fla.1990), and Ferrell. See Chandler, 702 So.2d at 201.
Moreover, because we find that the trial court properly considered and weighed all of the evidence presented, we find no error in the court's rejection of Knight's proffered statutory mental mitigators. Foster; accord Gudinas v. State, 693 So.2d 953, 967 (Fla.) (affirming trial court's rejection of statutory mental mitigator where court concluded expert's opinion was "too heavily based upon unsupported facts"), cert. denied, 522 U.S. 936, 118 S.Ct. 345, 139 L.Ed.2d 267 (1997). While the judge found no statutory mitigators established, we also recognize that the judge found and weighed the proffered nonstatutory mitigation, including the fact that Knight suffered from "some degree of paranoia." The judge then properly exercised his discretion and determined that the nonstatutory mitigation had been established. Chandler, 702 So.2d at 201. We find no error in the trial court's handling of the various sub-claims in this issue.

*437 PROPORTIONALITY
In conjunction with our consideration of the previous claim, we address the issue of proportionality, as is our constitutional duty.[13]See Art. I, § 17, Fla. Const.; Tillman v. State, 591 So.2d 167, 169 (Fla. 1991) (identifying several state constitutional provisions which collectively mandate proportionality review in capital cases, "the purpose of which is to foster uniformity in death-penalty law"); see also Urbin, 714 So.2d at 417 (reaffirming that "proportionality review involves consideration of `the totality of circumstances in a case' in comparison with other death penalty cases").
After fully considering the evidence in this case as we have outlined above, we conclude that Knight's death sentences are proportional to other cases where sentences of death have been imposed. See Rolling v. State, 695 So.2d 278 (Fla.) (affirming death sentences for multiple murders despite defendant's significant statutory and nonstatutory mental mitigation, including family's history of mental illness and defendant's physically and mentally abusive childhood), cert. denied, 522 U.S. 984, 118 S.Ct. 448, 139 L.Ed.2d 383 (1997); Henyard v. State, 689 So.2d 239 (Fla.1996) (affirming two death sentences despite trial court's finding of both statutory mental mitigators and nonstatutory mitigation involving defendant's stunted emotional level, low intelligence, impoverished upbringing, and dysfunctional family), cert. denied, 522 U.S. 846, 118 S.Ct. 130, 139 L.Ed.2d 80 (1997).

EXTENDED DEATH ROW INCARCERATION AS CRUEL AND UNUSUAL PUNISHMENT
Finally, Knight claims that to execute him after he has already endured more than two decades on death row is unconstitutionally cruel and unusual punishment. He also argues that Florida has forfeited its right to execute Knight under binding norms of international law. Although Knight makes an interesting argument, we find it lacks merit. As the State points out, no federal or state courts have accepted Knight's argument that a prolonged stay on death row constitutes cruel and unusual punishment, especially where both parties bear responsibility for the long delay. See, e.g., White v. Johnson, 79 F.3d 432 (5th Cir.1996); State v. Smith, 280 Mont. 158, 931 P.2d 1272 (1996). We also note that the Arizona Supreme Court recently rejected this precise claim. See State v. Schackart, 190 Ariz. 238, 947 P.2d 315, 336 (1997) (finding "no evidence that Arizona has set up a scheme prolonging incarceration in order to torture inmates prior to their execution"), cert. denied, ___ U.S. ___, 119 S.Ct. 149, 142 L.Ed.2d 122 (1998). Second, we also consider that irrespective of the status of this case, Knight has been and will remain incarcerated on death row for his 1980 murder of Officer Burke until that case is finalized. We similarly reject Knight's claim under international law.

CONCLUSION
Accordingly, we affirm Knight's sentences of death.
It is so ordered.
SHAW, KOGAN, ANSTEAD and PARIENTE, JJ., concur.
HARDING, C.J., concurs specially with an opinion, in which OVERTON, J., concurs.
WELLS, J., concurs in part and dissents in part with an opinion.
HARDING, C.J., specially concurring.
I write separately to express my agreement with the majority's conclusion that the trial court erred in finding the heinous, atrocious, or cruel aggravating factor applicable in the instant case. I also write to explain why the instant case is distinguishable from Preston v. State, 607 So.2d 404 *438 (Fla.1992), which both the sentencing order and Justice Wells cite in support of applying the HAC aggravator in this case.
As expressed in its sentencing order, the trial court concluded that the heinous, atrocious, or cruel nature of the murders committed by Knight "lies not in the method of [the victims'] execution[-]style murder[s] but in the torturous hours that preceded them." Execution-style killings are not generally HAC unless the State has presented other evidence to show some physical or mental torture of the victim. Hartley v. State, 686 So.2d 1316, 1323 (Fla. 1996), cert. denied, 522 U.S. 825, 118 S.Ct. 86, 139 L.Ed.2d 43 (1997). While the factual circumstances preceding the victims' killings in the instant case (being abducted at gunpoint, being coerced to withdraw money from their bank account, and being forced to drive to the remote location where they were shot) are supported by the record, the court's description of the victims' thoughts and feelings during their ordeal is based on conjecture and speculation. The sentencing order repeatedly states that the events "must have been horrifying" to the victims and that they must have anticipated "a horrible and painful death." "Speculation that the victim may have realized that the defendant[] intended more than a robbery when forcing the victim to drive to the field is insufficient to support [the HAC] aggravating factor." Hartley, 686 So.2d at 1323-24.
In order for the HAC aggravating circumstance to apply, the murder must be both conscienceless or pitiless and unnecessarily torturous to the victim. Richardson v. State, 604 So.2d 1107, 1109 (Fla. 1992). While I agree with the trial court that "common sense" tells us that almost anyone faced with a loaded weapon would experience uncertainty, confusion, and fear, these normal responses are not enough to support the HAC aggravator nor do they rise to the level of "unnecessarily torturous to the victim," without additional acts that set the crime apart from the norm of capital felonies. See, e.g., Wyatt v. State, 641 So.2d 1336, 1340-41 (Fla.1994) (concluding that HAC finding was proper based upon victims'"mental anguish" where defendant subjected them to twenty minutes of abuse prior to their deaths, including pistol-whipping one victim, raping the second victim, and taunting the third victim "to listen real close to hear the bullet coming" as he aimed a gun at the victim's ear); Rivera v. State, 561 So.2d 536, 540 (Fla.1990) (upholding HAC based upon "fear and emotional strain preceding a victim's death" where defendant abducted eleven-year-old girl, took her to a field where he sexually assaulted her, and testimony indicated that victim screamed and resisted until he was able to kill her by asphyxiation); Adams v. State, 412 So.2d 850, 857 (Fla.1982) (upholding HAC based upon "fear and emotional strain" preceding eight-year-old girl's death where record evidence showed that victim was "screaming" prior to death and was strangled by defendant).
In Preston, we concluded that the victim "[u]ndoubtedly" suffered fear and terror when Preston forced her "to drive to a remote location, made her walk at knife-point through a dark field, forced her to disrobe, and then inflicted a wound certain to be fatal." Preston, 607 So.2d at 409. While this language might appear to support the application of the HAC aggravator in the instant case, the language of Preston must be considered within the factual circumstances of that case. The wound that Preston inflicted was "`[t]he deliberate slashing of the throat of the victim from one side to the other with the force necessary to sever the jugular veins, trachea and main arteries.'" Preston v. State, 444 So.2d 939, 945 (Fla.1984) (quoting from the original sentencing order).[14] *439 This knife wound to the victim's throat resulted "in her near decapitation." 607 So.2d at 406. The victim also sustained "multiple stab wounds and lacerations." Id.
This Court has consistently upheld the heinous, atrocious, or cruel aggravator where the victim was repeatedly stabbed. See Derrick v. State, 641 So.2d 378, 381 (Fla.1994); Floyd v. State, 569 So.2d 1225, 1232 (Fla.1990); Haliburton v. State, 561 So.2d 248, 252 (Fla.1990); Nibert v. State, 508 So.2d 1, 4 (Fla.1987); Johnston v. State, 497 So.2d 863, 871 (Fla.1986). Thus, the very nature of the attack in Preston supported the HAC finding. This was also the circumstance in many of the cases where the "fear and emotional strain preceding [the] victim's almost instantaneous death" was considered as contributing to the heinous nature of the murder. Adams, 412 So.2d at 857 (finding that victim's murder by strangulation was HAC and noting that Court has found this method of homicide to be HAC); see also Hitchcock v. State, 578 So.2d 685, 693 (Fla. 1990) (upholding HAC aggravator and stating that strangulations are nearly per se heinous).
If we approved the application of the HAC aggravating factor in the instant case without some factual proof of the victims' mental torture, then the factor would apply in every instance where a normal person might feel fear. This would exclude only those homicides where the victim was ambushed or killed without awareness of the assailant. This clearly would go far beyond finding the HAC factor to be "appropriate in a `conscienceless or pitiless crime which is unnecessarily torturous to the victim.'" Richardson, 604 So.2d at 1109 (quoting Sochor v. Florida, 504 U.S. 527, 536, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992)). I believe that such a broad interpretation of the HAC aggravating factor would render it unconstitutional because it would not provide the sentencer with adequate guidance. See Sochor, 504 U.S. at 536, 112 S.Ct. 2114. Accordingly, I conclude that the HAC factor is not permissible based on the present facts and concur with the majority opinion in striking this aggravator.
OVERTON, J., concurs.
WELLS, J., concurring in part and dissenting in part.
I concur in result only with the majority's decision.
I do not concur with footnote 10 that the prosecutor's comment was "probably subject to a valid objection." Further, I do not concur in the striking of HAC, and I believe under these facts that HAC is supported by competent, substantial evidence and that the application of the aggravator is consistent with this Court's decision in Preston v. State, 607 So.2d 404 (Fla.1992).
To conclude that this ordeal, which lasted several hours, did not provide factual proof of the victims' mental torture means that our law has to ignore the obvious and defy common sense and human experience. I do not believe our law has to do this, and I will not.
While I agree that the length of time Knight has been on death row does not create a constitutional impediment to his execution, I do again state my view that such an extended time period to finally adjudicate these cases is totally unacceptable and is this Court's and the State's prime responsibility to correct. See Elledge v. Florida, ___ U.S. ___, 119 S.Ct. 366, 142 L.Ed.2d 303 (1998) (No. 98-5410) (Breyer, J., dissenting). The murders in this case were committed in July 1974; Knight was convicted of the murders in April 1975. The courts and the State must be able to do better, and any explanation *440 of why we are unable to do so is insufficient.
NOTES
[1] The trial court found the following statutory aggravators: (1) Knight was previously convicted of a felony involving the use or threat of violence to the person, § 921.141(5)(b), Fla. Stat. (1995); (2) the murders were committed while Knight was engaged in the commission of a kidnapping, § 921.141(5)(d); (3) the murders were committed for the purpose of avoiding or preventing a lawful arrest, § 921.141(5)(e); (4) the murders were committed for pecuniary gain, § 921.141(5)(f); (5) the murders were especially heinous, atrocious, or cruel (HAC), § 921.141(5)(h); and (6) the murders were committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP), § 921.141(5)(i). The trial court considered and rejected Knight's proffered statutory mental mitigators. In nonstatutory mitigation, the trial court found and gave weight to the fact that Knight was a victim of childhood abuse; that he suffered from some degree of paranoia; and that he was raised in poverty.
[2] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[3] The court noted that the district court rendered its opinion prior to the Supreme Court's decision in Hitchcock. Knight, 863 F.2d at 708.
[4] Nelson testified that Knight never became "hinge key," which is an FBI term for a suspect who is looking over his shoulder or who is concerned and paranoid that somebody might be following him.
[5] STOL stands for Short Takeoff and Landing, like the United States Marine Corps AV-8B Harrier aircraft.
[6] The claims are: (1) the trial court erred in allowing the presentation of Detective Smith's hearsay testimony; (2) the trial court erred in allowing Detective Smith to remain in the courtroom throughout the proceeding; (3) the prosecutor improperly relied on the future dangerousness nonstatutory aggravator; (4) the trial court in not instructing the jury that any life sentences would be consecutive; (5) the trial court erred in instructing the jury that Knight's absence was caused by his courtroom misconduct; (6) the trial court erred in allowing Dr. Miller's testimony; (7) the trial court erred in denying the defense's peremptory challenge of juror Rivero-Saiz; (8) the trial court erred in excluding jurors Weldon, Zaribaf, and Cunningham from the panel; (9) improper prosecutorial argument denied Knight a fundamentally fair and reliable sentencing proceeding; (10) the trial court erred in not instructing the jury on merged aggravators; (11) the trial court erred in instructing the jury on the prior violent felony aggravator; (12) the trial court erred in instructing the jury on the cold, calculated, and premeditated (CCP) aggravator; (13) the trial court erred in instructing the jury on the heinous, atrocious, or cruel (HAC) aggravator; (14) the trial court erred in not instructing the jury on Knight's requested instruction on statutory mental mitigators; (15) the trial court erred in sentencing Knight to death; (16) Florida's death penalty statute is unconstitutional; and (17) executing Knight after his prolonged incarceration on death row constitutes cruel and unusual punishment.
[7] Claim (7) is procedurally barred because the defense did not renew its objection before the jury was sworn. Melbourne v. State, 679 So.2d 759, 765 (Fla.1996). Claim (13) is without merit, having been rejected by this Court on numerous occasions where, as here, the HAC standard jury instruction is the same instruction approved in Hall v. State, 614 So.2d 473, 478 (Fla.1993), and found sufficient to withstand vagueness challenges to both the instruction and the aggravator. See Chandler v. State, 702 So.2d 186, 201 (Fla. 1997), cert. denied, 523 U.S. 1083, 118 S.Ct. 1535, 140 L.Ed.2d 685 (1998); Monlyn v. State, 705 So.2d 1 (Fla.1997), cert. denied, 524 U.S. 957, 118 S.Ct. 2378, 141 L.Ed.2d 745 (1998); Davis v. State, 698 So.2d 1182 (Fla. 1997), cert. denied, 522 U.S. 1127, 118 S.Ct. 1076, 140 L.Ed.2d 134 (1998). Finally, claim (16) has been consistently rejected by this Court, most recently in Richardson v. State, 706 So.2d 1349, 1356 (Fla.1998). See also San Martin v. State, 705 So.2d 1337, 1350 (Fla.1997), cert. denied, ___ U.S. ___, 119 S.Ct. 105, 142 L.Ed.2d 84 (1998); Williamson v. State, 681 So.2d 688 (Fla.1996); Hunter v. State, 660 So.2d 244 (Fla.1995).
[8] We also note that the trial court, in considering Knight's objection to Smith presenting a summary of former trial testimony, offered Knight the opportunity to have that testimony read to the jury as an alternative to Smith's presentation. In addition, Nelson's nonhearsay testimony covered much of the same ground and he participated throughout the surveillance, while the helicopter pilot only became involved at the end. Moreover, while Smith admittedly was called to the stand to rebut the defense's theory that the air surveillance caused Knight's loss of mental faculties, his recitation of Detective Ojeda's trial testimony recounted the same subject matter as that presented by Nelson.
[9] We likewise reject on procedural grounds Knight's claim that statements by the STOL pilot and Detective Ojeda should not have been admitted (through the testimony of Smith) absent a showing that the pilot and the detective were unavailable. Knight did not object to Smith's testimony as to statements made by either of these persons.
[10] On the merits, Knight is certainly correct that a future dangerousness nonstatutory aggravating factor does not exist in Florida. See Kormondy v. State, 703 So.2d 454, 463 (Fla. 1997) (noting that Florida's death penalty statute "does not authorize a dangerousness aggravating factor"). Of course, "the only matters that may be asserted in aggravation are those set out in the death penalty statute." See Moore v. State, 701 So.2d 545, 552 (Fla. 1997) (Anstead, J., concurring in part and dissenting in part), cert. denied, 523 U.S. 1083, 118 S.Ct. 1536, 140 L.Ed.2d 685 (1998) and cases cited therein. Consequently, there is no such thing as a nonstatutory aggravating factor in Florida. At the same time, the State makes the argument that the prosecutor's "kill, and kill and kill again" comment was a proper statement of the evidence regarding Knight's past murders of Mr. and Mrs. Gans and Officer Burke and not a prediction of future homicidal violence if released. Cf. Walker v. State, 707 So.2d 300, 313-14 (Fla. 1997) (finding improper prosecutor's query of neuropsychologist, "[w]ell, do you think [Walker] may kill again?"). Although the comment approaches the border of impropriety, and was probably subject to a valid objection, we conclude that the State did not impermissibly inject Knight's "future dangerousness" into the proceeding as an unlawful nonstatutory aggravating circumstance sufficiently to constitute fundamental error.
[11] Immediately after Knight's second removal from the courtroom, the following exchange took place between the prosecutor, Mr. Laeser, and the trial judge:

Mr. Laeser: I think the first thing that concerns me is whether or not we are going to spend an hour every morning going through the theater of the absurd or whether this proceeding is not going to have the benefit of Mr. Knight on future days.
The Court: No. I am afraid that we are going to have toit was not an hour. I actually counted 25 minutes. I feel obligated to ensure that no other judge is ever going to have to go through this, and I want the defendant here every day. If he can behave and he can announceor it appears that he can behave, we will let him stay.
[12] The new standard CCP jury instruction was approved by this Court on December 7, 1995. See Standard Jury Instructions in Criminal Cases, 665 So.2d 212 (Fla.1995).
[13] Neither party addressed this issue in their briefs.
[14] On appeal from the denial of relief on Preston's second postconviction motion, this Court vacated Preston's death sentence and ordered resentencing. Preston v. State, 564 So.2d 120 (Fla.1990). Preston's prior felony conviction was set aside due to ineffective assistance of trial counsel, leaving only two of the four aggravating circumstances found by the trial court. Obviously, the factual circumstances of the wounds inflicted on the victim did not change when the original sentencing order was vacated by this Court.