564 So.2d 124 (1990)
Henry GARCIA, Appellant,
v.
STATE of Florida, Appellee.
No. 73075.
Supreme Court of Florida.
June 14, 1990.
Rehearing Denied August 21, 1990.
*125 Michael Zelman of Michael Zelman, P.A., Coral Gables, for appellant.
Robert A. Butterworth, Atty. Gen., and Ivy R. Ginsberg, Asst. Atty. Gen., Miami, for appellee.
BARKETT, Justice.
Henry Garcia appeals his convictions of two counts of first-degree murder, one count each of sexual battery and armed burglary, and two sentences of death. We reverse the convictions, vacate the sentences of death, and remand for a new trial.[1]
On Monday, January 17, 1983, neighbors discovered the bodies of Julia Ballentine, 90, and her sister, Mabel Avery, 86, in the victims' home in Leisure City, Dade County, Florida. A medical examiner testified that both women had been stabbed to death with multiple stab wounds, and Ballentine had been sexually assaulted.
Evidence showed that the victims' home probably had been broken into Saturday night or Sunday morning. The rear patio screen door had been slashed and a jalousie window had been broken. One witness said she heard the glass break at 6 a.m. Sunday. When the bodies were discovered the next day, investigators were unable to find the victims' purses, wallets, or other personal items of identification. Authorities lifted seven latent fingerprints from the house, and they photographed a partial impression of a footprint made by the heel of a shoe. However, that evidence proved inconclusive or could not be linked to Garcia. Hair samples also had been taken from the bodies and the crime scene. Those samples either were not similar to hair samples taken from Garcia, or the hair comparison analysis proved inconclusive. There was no physical evidence to link Garcia to the crime.
Elizabeth Feliciano and her son, Feliciano Aguayo, testified that at about 7 a.m. Sunday, Garcia showed up at their residence with blood splattered on his shirt, pants, and shoes. The Aguayo home was about one-half mile from the victims' home. Aguayo testified that Garcia told him he had been assaulted by two men and a woman alongside the road as he walked home from a bar where he had been drinking. He said they attacked him with a tire iron, and he defended himself by stabbing them with his knife, after which he fled to an adjacent corn field. Garcia showed Aguayo his pocket knife: it had a bent tip and had blood on it, and the blade was at least four inches long. Aguayo said Garcia kept repeating, "I told them not to make me mad, that I had an animal inside of me." Aguayo said he and others visited the corn field area later that day, but they found no sign of a bloody struggle. The only injury he saw on Garcia was a scratch around his eye.
Rufina Perez testified that she was a migrant farm worker picking crops for Lupe Trevino in January 1983 at the same time Garcia worked there. She said she overheard Garcia say to fellow workers, "I got in a fight, I got in trouble with these ladies ... but I don't have to worry about it because they already in hell." She said Garcia told the others, "I went to the back door, I ripped out the screen door." She said Garcia stopped talking when he realized that she had been listening. She could not identify the men with whom Garcia spoke that day.
Garcia attempted to impeach Perez's testimony by introducing payroll records to show that it could not have been Garcia whom Perez overheard that day because the records reflect that Garcia was no longer employed with Perez when the murders occurred. The payroll record under the name "Rufina Peres" indicates, in relevant part, that she was paid wages during at least portions of each week in January and February 1983. The payroll record under the name "Enrique Juares," which Garcia claims to be one of his aliases, indicates that he was paid wages during the week that ended January 7, 1983, but that he was paid no wages thereafter. Garcia argued that the jury should be allowed to infer from the absence of any notation of *126 wages paid after January 7 that he did not work for Trevino with Perez during or after the period when the murders were committed and the bodies were discovered, January 15-17. Thus, Perez must have heard somebody else make the incriminating statement.
The payroll records were brought to court by Trevino's daughter, Aida Paz, who said she and her sister, Irma, recorded the data in the regular course of business as each employee worked. Paz said she was a custodian of the records, and that the records were kept in her home. However, the trial court barred the admission of the "Enrique Juares" payroll record, ruling that it had not been sufficiently authenticated, it was untrustworthy, unreliable, and irrelevant.
Garcia did not testify in either the guilt or penalty phases. The jury convicted him of two counts of first-degree murder, and one count each of armed burglary and sexual battery. He received two sentences of death consistent with unanimous jury recommendations.
We deal here with Garcia's contentions that the trial court abused its discretion by excluding the payroll record as impeachment evidence, and that the state erroneously argued to the jury that police searched for but were unable to find any exculpatory records because none existed. The state's argument boils down to an attack on the relevancy of the payroll record. Specifically, the state relies on the hearsay exception for regularly kept business records, section 90.803(6) of the Florida Statutes (1981), and argues that (a) the payroll record was inherently unreliable and untrustworthy and did not comply with state and federal statutory requirements for migrant farm labor records; and (b) the payroll record was not relevant because the evidence failed to connect the "Enrique Juares" record to the defendant, Henry Garcia, and it was not exculpatory. We agree with Garcia, reject the state's argument, and find reversible error.
Section 90.608(1)(e) of the Florida Statutes (1981), provides a party the right to impeach by offering "[p]roof by other witnesses that material facts are not as testified to by the witness being impeached." Thus, Garcia had the right to have Paz produce the payroll record for the jury to cast some doubt on the credibility of Perez's identification of Garcia as the man she said she heard make an inculpatory statement, provided that the evidence was relevant impeachment evidence.
As with all evidence, relevancy must be established as a condition precedent to admissibility. §§ 90.401-.402, Fla. Stat. (1981). Relevancy is a broad, malleable concept that may involve many different inquiries to determine whether evidence tends to prove or disprove a material fact. One such inquiry is authenticity. See, e.g., 6C Fla. Stat. Ann. § 90.901 p. 376 (West 1979) (Law Revision Council Note  1976) ("Authentication and identification are implicit in the concept of relevancy."); C. Ehrhardt, Florida Evidence § 901.1, at 570 (2d ed. 1984) (authentication is a "specific application[] of the general requirement of relevancy"); McCormick on Evidence § 218, at 543 (2d ed. 1972). Authentication is a judicial determination that a document may be the genuine document that the offering party claims it to be.
Evidence is authenticated when prima facie evidence is introduced to prove that the proffered evidence is authentic. The finding of authenticity does not mean that the trial judge makes a finding that the proffered evidence is genuine. He only determines whether prima facie evidence of its genuineness exists. Once the matter has been admitted the opposing party may challenge its genuineness. The jury then determines as a matter of fact whether the proffered evidence is genuine.
Ehrhardt, supra, § 901.1, at 570-71. See also, e.g., 6C Fla. Stat. Ann. § 90.901, at 376-81 (West 1979) (Law Revision Council Note  1976); McCormick, supra, § 227; VII Wigmore on Evidence § 2128 (J. Chadbourne ed. 1978).
It is clear that Garcia authenticated the record with Paz's testimony. Paz testified that she was custodian of the payroll records for her father's business. She said *127 either she or her sister recorded the data contemporaneous to the work being performed, that they kept the payroll records in the regular course of business, and that they had maintained the records at home since they made them in 1983. The trial court abused its discretion by finding that the evidence was not properly authenticated. Cf. Holley v. State, 328 So.2d 224, 225 (Fla. 2d DCA 1976) (Grimes, J.) (machinestamped motel registration card presented by custodian was authenticated to satisfy hearsay exception for regularly kept business records).
We also reject the state's contentions that the record is inherently unreliable and untrustworthy because the payroll record spelled the alias as "Juares" instead of "Juarez"; it contained inadequate information; it was not in the handwriting of the custodian who testified; and it was unsupported by other documentation. First, we note that the state did not contest the identity of Rufina Perez's payroll record even though that record misspelled her name as "Rufina Peres." Second, evidence shows that migrant farm laborers often do not produce much identifying information for their employers. The assertion that the payroll record failed to satisfy federal and state recordkeeping requirements for employers of migrant farm labor is totally inapposite. Whether the record satisfied statutory standards for recordkeeping has no bearing whatsoever on the question of whether the records contained otherwise relevant information. Finally, nothing in Florida law requires a document to be in the custodian's own handwriting or to be supported by other documentation as a general prerequisite to admissibility of business records.
The state next argues that the payroll record was irrelevant because there was no proof to link the "Enrique Juares" named in the payroll record with the defendant, Henry Garcia.[2] The trial record indicates otherwise. The state acknowledges that Garcia worked with Perez in January 1983, because Perez's inculpatory testimony necessarily was predicated on the fact that she was acquainted with Garcia as a coworker and heard him make the statement on a work break. Also, evidence shows conclusively that the state knew that Garcia had been known by the name Enrique Juarez. The indictment prepared by the state and approved by the grand jury named "HENRY GARCIA also known as DAVID GARCIA also known as ENRIQUE JUAREZ." The state in the penalty phase introduced evidence of Garcia's pre-1983 convictions under the names "Enrique Juarez" and "Henry Juarez." An investigator testified at trial that he was aware that Garcia had been known as Enrique Juarez. Paz then testified that she was asked to produce all payroll records under the three names used in the indictment to identify the defendant, and the only record she had under any of those names was the "Enrique Juares" record that she brought to court. The evidence clearly established more likely than not that Garcia and the payroll record were linked together.
Likewise, we reject the state's contention that the evidence was irrelevant because it would have had no exculpatory value. Garcia's theory of defense was that he was not the person who committed the crimes. Perez's testimony provided a crucial link between Garcia and the crimes. The payroll record could have impeached Perez's testimony if the jury gave it significant weight, thereby helping Garcia to establish that he may not have been the person whom Perez heard make a self-incriminating statement. Certainly the link between Garcia and the crime was a material fact to which the payroll record had some relevance.
Although the evidence was being offered only for the limited purpose of impeachment, the payroll record would have had no impeachment value had it not also been offered to prove the truth of the matter asserted  that Garcia was not employed with Perez when she heard her co-worker *128 make the incriminating statement.[3] Thus, the payroll record had to satisfy an exception to the hearsay rule. §§ 90.801-.802, Fla. Stat. (1981). We find that the evidence satisfied the hearsay exception of section 90.803(7) of the Florida Statutes (1981), which expressly provides for the admissibility as substantive evidence of assertions implied from the absence of an entry in the records of a regularly conducted activity.[4]See Williams v. State, 406 So.2d 86, 87 (Fla. 1st DCA 1981) (probation violation proved from absence of defendant's regular monthly reports). That section allows the admissibility of
[e]vidence that a matter is not included in the memoranda, reports, records, or data compilations, in any form, of a regularly conducted activity to prove the nonoccurrence or nonexistence of the matter, if the matter was of a kind of which a memorandum, report, record, or data compilation was regularly made and preserved, unless the sources of information or other circumstances show lack of trustworthiness.
§ 90.803(7), Fla. Stat. (1981).
The state contends that the payroll record was not trustworthy evidence. We disagree. Trustworthiness in this context is merely an aspect of relevancy, and for all the reasons we previously gave, there was sufficient evidence to establish that the payroll record was relevant enough to allow a jury to estimate its worth. Moreover, the trustworthiness requirement here compels a court to consider the motive of the recordkeeper:
Problems of the motivation of the informant have been a source of difficulty and disagreement. If the recorder's motive is not to be correct but rather is to prepare for litigation, the report is inadmissible. Because of the difficulty of stating in specific terms the circumstances of admissibility, the exception contains the phrase "unless the sources of information or other circumstances indicate a lack of trustworthiness."
6C Fla. Stat. Ann. § 90.803, at 273 (West 1979) (Law Revision Council Note  1976) (citation omitted);[5] Ehrhardt, supra, § 803.7, at 497 ("The motive of the entrant and manner of keeping the records could provide this lack of trustworthiness."). There is no question that the recordkeeper had proper motives. Thus, we find that the payroll record satisfied the hearsay exception. Cf. Holley, 328 So.2d at 225 (motel registration record satisfied business records hearsay exception).
Under the circumstances presented, we find that the payroll record was relevant admissible evidence, and the jury should have been allowed to make its own independent factual determination of the payroll record's significance.[6] The trial court abused its discretion by excluding it.
The state compounded that error in its closing argument by falsely arguing to the jury:
[Y]ou can't get the records. I wouldn't say we didn't look for them. You better believe we looked for them. The police *129 looked for them but they simply didn't exist, and that's why you didn't hear any records in this courtroom, even though you heard testimony from a woman who alleged to have some.
The state now concedes that it was error to present that argument to the jury, but argues that the error was not reversible. Standing alone, the fallacious argument might not be reversible error. But, combined with the prejudicial effect of excluding the same relevant evidence that the state argued did not exist, we find that Garcia was denied his right to a fair trial.
We are not persuaded that these combined errors were harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So.2d 1129 (Fla. 1986). The payroll record could have impeached a crucial link in the chain of circumstantial evidence. Without Perez's testimony, the only evidence against Garcia is that he was in the neighborhood and that he had blood on his shoes, clothes, and knife. Despite all the blood, fingerprints, hairs, and other evidence found at the crime scene, not one piece of physical evidence or eyewitness testimony tied Garcia to these murders. Judging the facts from a cold record, we cannot say beyond a reasonable doubt that the jury would have reached the same result had it seen the payroll record and heard proper arguments of counsel.
Because the aforementioned discussion disposes of this case, we do not address any of Garcia's other arguments presented on appeal. We reverse the convictions, vacate the sentences of death, and remand for a new trial.
It is so ordered.
EHRLICH, C.J., and OVERTON, McDONALD, SHAW and GRIMES, JJ., concur.
KOGAN, J., recused.
NOTES
[1] We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution.
[2] At trial the state did not argue that Garcia and Juarez in fact were not the same person. Rather, the state argued that the payroll record lacked sufficient indicia of reliability.
[3] This unusual situation is in contrast to more common impeachment problems where the impeachment evidence need not be substantively true to have value as impeachment evidence, i.e., most prior inconsistent statements.
[4] The state's argument relies on section 90.803(6) of the Florida Statutes (1981). Section 90.803(6) deals with the admissibility of regularly kept business records to prove matters asserted in the records. This case, however, concerns an implied assertion. We need not determine here whether an implied assertion falls within the ambit of section 90.803(6), because section 90.803(7) of the Florida Statutes (1981), expressly deals with an assertion implied from the absence of an entry in a regularly kept record. Thus, our analysis focuses on section 90.803(7).
[5] This excerpt of the Law Revision Council Note directly referred to section 90.803(6), which allows for the admissibility of records of regularly conducted business activity. Because section 90.803(6) contains the identical "trustworthiness" requirement as section 90.803(7), and because the purpose of the two statutes is identical, we read them in pari materia to ascertain the meaning intended by the legislature in section 90.803(7).
[6] We do not comment here on whether the payroll record was in fact the record of the defendant. Rather, we merely find that a sufficient nexus existed between the defendant and the payroll record to allow the jury to consider it when the jury weighs all of the evidence.