949 So.2d 980 (2006)
Henry GARCIA, Appellant,
v.
STATE of Florida, Appellee.
Henry Garcia, Petitioner,
v.
James R. McDonough, etc., Respondent.
Nos. SC04-866, SC05-1316.
Supreme Court of Florida.
November 9, 2006.
Rehearing Denied February 15, 2007.
*983 Neal A. Dupree, Capital Collateral Regional Counsel, Southern Region, William M. Hennis, III, Litigation Director, CCRC and Roseanne Eckert, Assistant CCRC, Fort Lauderdale, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL and Sandra S. Jaggard, Assistant Attorney General, Miami, FL, for Appellee/Respondent.
PER CURIAM.
Henry Garcia, a prisoner sentenced to death, appeals the denial of his motion for postconviction relief under Florida Rule of Criminal Procedure 3.850 and also petitions for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. As explained below, we affirm the denial of Garcia's 3.850 motion and deny his habeas petition.

I. FACTS AND PROCEDURAL HISTORY
Two elderly sisters were found dead in their home on January 17, 1983. They had been stabbed repeatedly  one thirty times and the other fourteen times. Many of their wounds were defensive. One also suffered vaginal and anal injuries, inflicted while she was still alive. According to the medical examiner, the women died in the early morning hours of Sunday, January 16, 1983. A next-door neighbor corroborated that at 6 a.m. on Sunday she awoke to the sound of breaking glass. Whoever committed the crimes had broken some *984 glass panes and slashed the screen on the victims' back door.
On the evening before the murders, Garcia planned to go on a date with his employer's daughter. She cancelled the date, however, so that she could spend time with another man. Feliciano Aguayo, who worked with Garcia in the fields and considered him a friend, noticed that Garcia was angry and urged him to spend the night at home. Instead, Garcia persuaded Aguayo to drop him off at a bar about a half-mile from the victims' house. Aguayo and his family also lived about a half-mile from the victims. At 7 a.m. the next morning, Aguayo's mother Elizabeth Feliciano saw Garcia running toward their home from that direction. She observed blood on his clothes and face.
Garcia came to the door and asked for Aguayo, who went outside to speak with him. According to Aguayo, Garcia was "upset" and "scared." He had fresh blood on his clothing and a bent knife "full of blood." Garcia told Aguayo that he had been walking home from a bar fifteen miles away (not the nearby bar where Aguayo dropped him off) when suddenly he was attacked "for no reason at all" by two men and a woman who beat him with a tire iron in the middle of a field. He claimed to have stabbed the woman and possibly one man in self-defense. As Aguayo drove Garcia to his labor camp, Garcia kept repeating, "I told them not to get me mad. I have this animal inside of me."
Shortly after the murders, Rufina Perez overheard Garcia speaking to a group of men in the fields, where she also worked. She initially thought they were joking. Garcia admitted that he "got in trouble with these women," but kept saying that he did not "have to worry about it, because they are already in hell." One of the men asked him, "Te las chingastes?"  meaning, "Did you fuck them up?"  to which Garcia responded affirmatively. He explained that, to gain entry to their home, he "went through the back door" and "ripped out the screen door." When Garcia noticed that Perez was eavesdropping, he cut off the conversation.
At the first trial in this case, the jury convicted Garcia of both murders and unanimously recommended two death sentences, which the trial court imposed. We reversed his convictions, however, and remanded for a new trial because the trial court had prevented Garcia from introducing payroll records indicating that his employment in the fields ended more than a week before the murders, and thus before the conversation that Perez allegedly overheard. See Garcia v. State, 564 So.2d 124 (Fla.1990). We explained that "Perez's testimony provided a crucial link between Garcia and the crimes." Id. at 127.
At the retrial, Garcia introduced the payroll records. Nevertheless, the jury found him guilty of both murders, as well as one count each of sexual battery and armed robbery. For his murder of the sister who was sexually assaulted, the jury unanimously recommended a death sentence. For the other sister's murder, it recommended a life sentence by a vote of seven-to-five. The trial court found four aggravating factors for each murder: (1) murder committed under a sentence of imprisonment; (2) prior violent felony conviction; (3) murder committed while engaged in sexual battery; and (4) murder was especially heinous, atrocious, or cruel (HAC). Garcia did not present any mitigation evidence, and no mitigators were found. The trial court, overriding the jury's life recommendation for one of the murders, imposed two death sentences.
We affirmed Garcia's convictions and sentences on direct appeal. Garcia v. State, 644 So.2d 59 (Fla.1994), cert. denied, *985 514 U.S. 1085, 115 S.Ct. 1799, 131 L.Ed.2d 726 (1995). While acknowledging that "this case was based substantially on circumstantial evidence," we concluded "that the evidence was inconsistent with any reasonable hypothesis of innocence." Id. at 62.
Garcia then filed a motion for postconviction relief under rule 3.850. The circuit court denied most of his claims summarily, but granted an evidentiary hearing on others. Among them were claims that Garcia's trial counsel provided ineffective assistance because he failed to investigate and present mitigation evidence, as well as evidence of a familial relationship between the State's three main witnesses.
At the beginning of the evidentiary hearing, Garcia personally waived his penalty phase claims, contrary to his counsel's advice. As to the remaining guilt phase claims, he called only one witness: retrial counsel Reemberto Diaz. Diaz admitted that, in preparing for the retrial, he "relied primarily on the investigation that was done in preparation for the initial trial." The circuit court also admitted into evidence a postconviction deposition of Perez, who was gravely ill at the time. She admitted that another witness, Aguayo, was married to her sister. No one ever asked her about the relationship, so she had not disclosed it. She also admitted that Garcia's codefendant (who went unmentioned at trial) was her friend and that she visited him in prison.
After the evidentiary hearing, the circuit court denied all relief. Garcia now appeals to this Court. He also petitions for a writ of habeas corpus. We analyze each in turn.

II. 3.850 APPEAL
Garcia raises many issues in his 3.850 appeal. We begin by analyzing (A) whether he validly waived his penalty phase claims, (B) whether his postconviction counsel had a conflict of interest, and (C) whether he was improperly denied access to public records. We then analyze (D) the claims on which the circuit court granted an evidentiary hearing and (E) other claims that the circuit court summarily denied. Finally, we review (F) his cumulative error claim.

A. Waiver of Penalty Phase Claims
The circuit court granted an evidentiary hearing on Garcia's claims of ineffective assistance of counsel for failure to present mitigation evidence, including evidence of Garcia's mental health and his difficult childhood. However, when the evidentiary hearing began, Garcia  against his counsel's advice  announced that he no longer wished to pursue any penalty phase claims. The circuit court, after conducting an extensive colloquy, accepted this waiver. Garcia now claims that the court erred by accepting the waiver without first requiring his counsel to proffer all available mitigation evidence into the record.
We find no error. The precedents on which Garcia relies in demanding a full proffer of all available mitigation evidence did not involve the waiver of postconviction penalty phase claims; they involved the waiver of mitigation at the trial itself. In the pivotal case, Koon v. Dugger, 619 So.2d 246 (Fla.1993), we recognized "the right of a competent defendant to waive presentation of mitigating evidence" at trial. Id. at 249. To ensure a valid waiver, we imposed various procedural requirements, including that defense counsel explain whether "he reasonably believes there to be mitigating evidence that could be presented and what that evidence would be." Id. at 250. More recently, in Muhammad v. State, 782 So.2d 343 (Fla.2001), we emphasized that the trial court should always "consider all mitigating evidence `contained anywhere in the record, to the *986 extent it is believable and uncontroverted,'" even if the defendant wishes not to present mitigation. Id. at 363 (quoting Farr v. State, 621 So.2d 1368, 1369 (Fla. 1993)).
We have not, however, extended this logic to a defendant's waiver of postconviction penalty phase claims. See, e.g., Ferrell v. State, 918 So.2d 163, 174 (Fla. 2005) (holding that a defendant who merely "opted to forego" the presentation of evidence thereby waived his claim of ineffective assistance of counsel in failing to seek a social worker's assistance) (quoting Owen v. State, 773 So.2d 510, 515 (Fla. 2000)). The two situations are drastically different. At trial, the sentencer needs to decide whether to impose the death penalty. Mitigation evidence is always relevant to that decision. Conversely, at the postconviction stage, prisoners need not argue at all trial counsel's ineffectiveness in failing to present mitigation evidence. Moreover, even if they do bring such claims, they must prove trial counsel's deficiency before the effect of that mitigating evidence becomes relevant. Because of these distinctions, we have not required a full proffer of available mitigation evidence before a postconviction waiver of penalty phase claims. We require only that such waivers be "knowing, intelligent, and voluntary." Alston v. State, 894 So.2d 46, 57 (Fla.2004) (using this language in a different context, where a prisoner waived his rights to "postconviction counsel and proceedings") (quoting Durocher v. Singletary, 623 So.2d 482, 485 (Fla.1993)).
We conclude that Garcia did waive his postconviction penalty phase claims knowingly, intelligently, and voluntarily. According to his colloquy with the trial court, Garcia discussed the waiver many times with his counsel and understood its ramifications. Although Garcia may not have known every detail of his penalty phase claims, he attested in a sworn affidavit that he read his entire postconviction motion, which adequately summarized the additional mitigation evidence that his counsel intended to present. The record strongly supports the trial court's decision to accept his waiver as valid.

B. Conflict of Interest
Garcia also claims that the trial court erred in allowing him to be represented by an attorney with a conflict of interest. At the beginning of the evidentiary hearing, just before the waiver colloquy, postconviction counsel revealed that his second cousin shared office space with Garcia's trial counsel, Reemberto Diaz. Asked about this relationship, Garcia stated that "it doesn't bother me at all." He then stated, "It's just shared space. It wasn't working together." When Diaz testified, however, he clarified that he did practice jointly with postconviction counsel's second cousin on some cases. Postconviction counsel claimed he was unaware of this fact and "would have no way of knowing" it. Diaz did not consider it "anything of a conflict nature." Asked again about the relationship, Garcia stated that it did not bother him, and that he wished to go forward with the hearing. Given that neither lawyer felt the relationship would affect the case, and in light of Garcia's informed consent, we agree with the trial court that no conflict existed.

C. Public Records
Garcia accuses the Miami-Dade Police Department of improperly withholding public records relevant to his case. They include notes from the interrogation of Wally Gomez, who saw Garcia on the day of the crime, as well as a sworn statement and lie detector results from Ann Gomez, who also saw Garcia that day. After conducting a search, the Department *987 "object[ed] to producing these records because they do not exist." The circuit court summarily denied relief on Garcia's public records claim. Garcia now seeks a remand for an evidentiary hearing.
We have "rejected the argument that an evidentiary hearing is required to resolve every postconviction motion that alleges a public records violation. The defendant must support his motion . . . with specific factual allegations." Johnson v. State, 904 So.2d 400, 404 (Fla.2005) (quoting Thompson v. State, 759 So.2d 650, 659 (Fla.2000)). In multiple cases, we have "upheld the summary denial of public records claims based on a defendant's mere speculation about the existence of unproduced records." Id. The case most similar to this one is Downs v. State, 740 So.2d 506 (Fla. 1999). There, the defendant alleged that a sheriff's office had withheld notes from witness interviews, whereas the interviewing officer attested that all records had been disclosed. Because the defendant "did not proffer or assert the existence of any evidence that such notes existed and were improperly being withheld," id. at 511, we affirmed the summary denial of relief. Id. at 518.
Like the defendant in Downs, Garcia alleges that a law enforcement agency is withholding records from witness interviews. Like the sheriff's office in Downs, the Department claims it has searched for the records and determined they do not exist. The sole reason that Garcia offers for believing in their existence is that both witnesses allegedly told his investigator that they were interviewed and that the conversations "should have been memorialized." Whether they were, in fact, memorialized remains pure conjecture. Because the Department has expressly denied that the records exist, we affirm the summary denial of Garcia's claim.

D. Evidentiary Hearing Claims
At the evidentiary hearing, Garcia attempted to prove that his trial counsel was ineffective in failing to present various facts to the jury, including (1) the familial relationship between the State's three main witnesses, (2) a police report containing inconsistent statements by one of those witnesses, (3) the existence of other suspects, and (4) Garcia's alleged intoxication at the time of the crime.[1] The standard that governs ineffective assistance claims is the two-pronged test from Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): first, Garcia must show that his counsel's performance was deficient  i.e., unreasonable under prevailing professional norms; and second, he must show that the deficiency prejudiced the defense  i.e., that it undermines confidence in the outcome of the trial by creating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Valle v. State, 778 So.2d 960, 965-66 (Fla.2001) (quoting Williams v. Taylor, 529 U.S. 362, 391, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). Applying this standard, the circuit court found neither deficiency nor prejudice on any of these claims. We review each one separately.

1. Witnesses' Relationship
The three witnesses whose testimony connected Garcia to the crime  Feliciano Aguayo, Elizabeth Feliciano, and Rufina *988 Perez  were all related to each other. Aguayo, whose mother is Elizabeth, married Perez's sister. Although this familial relationship was noted on an early police report, Garcia's trial counsel never mentioned it to the jury and could not recall it at the evidentiary hearing. The State, however, repeatedly told the jury that the witnesses were unconnected. Garcia claims his trial counsel was deficient in failing to expose the witnesses' relationship and in failing to argue that they might have fabricated their testimony in hopes of receiving a reward.
Nothing in the record suggests that the witnesses actually did conspire to testify against Garcia, or even that they sought remuneration for their testimony. One of the witnesses, Perez, denied hearing about the reward before trial. Another witness, Elizabeth Feliciano, knew of the reward but testified that she neither sought nor received any money. All that Garcia has demonstrated is a familial relationship. Even the strength of that relationship remains unclear. Perez testified that she did not know the Felicianos very well "because I never visit them." She apparently knew Aguayo better, but cautioned that their relationship "got nothing to do [with] what they say on the others." At the evidentiary hearing, Garcia's trial counsel testified that he would not have emphasized a familial relationship to the jury unless he could have shown that it influenced the witnesses' testimony. Absent any evidence that the relationship did, in fact, influence their testimony, we reject Garcia's ineffective assistance claim on both the deficiency and prejudice prongs.

2. Impeaching Perez
Garcia alleges that his trial counsel was ineffective in failing to impeach Perez with statements attributed to her in a police report from August 1983, seven months after the murders. The report states that Perez, while working in the fields, "heard [Garcia] say something like `Night before last I killed some guys and old ladies.'" At trial, however, and again in her postconviction deposition, Perez recalled the confession differently. She testified that Garcia spoke of killing women only  not men. She denied that Garcia's codefendant participated in the conversation, as the police report suggested. She also disputed the report's assertion that she refused to give the police a formal statement. She testified that the report, which wrongly referred to her by her former husband's last name, was "all lies." The circuit court, while not going that far, agreed that the report was "confusing" and "inaccurate," and dismissed it as having "little or no value for impeachment purposes."
We reach the same conclusion as the circuit court. The police report contains demonstrable inaccuracies. For example, it mistakenly refers to Perez as "Mrs. Feliciano"  the name of another main witness  only one sentence before recounting what Perez heard in the fields. The same carelessness could have pervaded other aspects of the report. Moreover, while Garcia would prefer to emphasize the differences between the report and Perez's trial testimony, an effective attorney would have been equally mindful of their similarities. The report states that Perez heard Garcia confess to "having stabbed to death a woman, possibly old, and that the woman did not even defend herself." Drawing the jury's attention to this earlier account might have been more harmful than helpful to the defense. Garcia, who failed to question trial counsel about this issue at the evidentiary hearing, clearly has not met his burden of proving deficiency. Additionally, we find no prejudice. More powerful challenges to Perez's testimony  for instance, that she delayed in telling the *989 authorities because she thought Garcia was joking, and that payroll records indicated that Garcia stopped working with Perez before the murders  were presented to the jury, which nonetheless returned a guilty verdict. Our confidence in the outcome is not undermined.

3. Other Suspects
Garcia alleges that his trial counsel was ineffective in failing to elicit additional testimony about other suspects  particularly a homeless suspect named John Conners, whose hairs were tested for comparison with "dirty" hairs found at the crime scene. Trial counsel acknowledged that Conners was a "good scapegoat" and recalled actively investigating him. He even mentioned Conners at various points in the trial. Yet he feared that by pushing the issue any further, he might inadvertently open the door for the State to explain why all other suspects had been cleared of suspicion, which was because Garcia's codefendant had confessed and implicated Garcia in the murders. Counsel did not want to risk the introduction of this evidence. Also, he feared that if he called the investigators most familiar with Conners, they would "stick it to me." Thus, he simply tried to show that Conners's involvement was "a reliable possibility."
In light of these reasonable strategic considerations, we agree with the circuit court that trial counsel's performance was not deficient. See, e.g., Robinson v. State, 913 So.2d 514, 524 (Fla.2005) ("Strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct.") (quoting Brown v. State, 894 So.2d 137, 147 (Fla.2004)). Also, we note that Garcia has not demonstrated prejudice. As the circuit court explained in rejecting this claim, Garcia has "produced no testimony concerning any other suspects."

4. The Intoxication Defense
At trial, Garcia's attorney did not attempt to mount an intoxication defense. He briefly mentioned intoxication, but only to explain Garcia's muddled memory of what happened on the night of the murders. Garcia claims his attorney was ineffective in failing to present the defense. As the circuit court correctly noted, however, an intoxication defense would have undermined Garcia's claim that he had nothing to do with the murders. Trial counsel strategically decided not to present such a defense. We have held that such decisions are not deficient. See, e.g., State v. Williams, 797 So.2d 1235, 1239 (Fla.2001) ("[C]ounsel cannot be deemed ineffective for failing to pursue the voluntary intoxication defense as such a defense would have been inconsistent with [defendant's] theory of the case.").

E. Summarily Denied Claims
While granting an evidentiary hearing on some of Garcia's claims, the circuit court denied most of them summarily. Garcia now appeals the summary denial of certain claims, alleging he is entitled to an evidentiary hearing. We have explained that "a defendant is entitled to an evidentiary hearing on a postconviction relief motion unless (1) the motion, files, and records in the case conclusively show that the prisoner is entitled to no relief, or (2) the motion or a particular claim is legally insufficient." Freeman v. State, 761 So.2d 1055, 1061 (Fla.2000) (citing rule 3.850 and various cases).
Applying this standard, we reject many of Garcia's claims without discussion. First, we reject various claims as procedurally barred because they were or could have been raised on direct appeal. These include Garcia's claims that the State presented *990 insufficient evidence of burglary and sexual battery; that the trial court failed to weigh unrefuted mitigation; that the trial court failed to play an independent role in sentencing; that the capital sentencing statute is unconstitutional; that Garcia's parole violation and other nonstatutory aggravators should not have been considered in sentencing; that improper comments by the prosecutor deprived him of a fair trial; and that the State used a "straw-man alibi" to shift the burden of proof. To the extent that Garcia tries to repackage these claims in the language of ineffective assistance, they remain procedurally barred. See, e.g., Cherry v. State, 659 So.2d 1069, 1072 (Fla.1995) (stating that a defendant on postconviction may not "counter the procedural bar" on issues that were or could have been raised on direct appeal by "couch[ing] his claim . . . in terms of ineffective assistance of counsel in failing to preserve or raise those claims").
We reject other claims because they are legally insufficient under controlling case-law. These include Garcia's claims that he is entitled to retroactive relief under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); that he is innocent of the death penalty; that Florida's system of lethal injection is unconstitutional; that the trial court's finding of the prior conviction aggravator violated Johnson v. Mississippi, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988); that his right to the assistance of competent mental health experts was denied; and that he is insane to be executed, which is a premature claim at this stage.
Finally, we reject various ineffective assistance claims because they are conclusively refuted by the record. The record shows that Garcia's trial counsel was not deficient in failing to present model prisoner testimony; in emphasizing the heinous nature of the crime; in making the closing argument; in failing to object to comments about the jury's advisory role; in failing to request a change of venue; in failing to object to the use of the underlying felony as an aggravator; in failing to prepare certain defense witnesses; in cross-examining certain State witnesses; in failing to refute misstatements about Garcia's relationship with the daughter of one of his employers; in failing to challenge the trial court's alleged bias; in failing to object to comments that diminished the importance of the penalty phase; or in failing to object to inadequate or inaccurate jury instructions. We also reject as insufficient Garcia's allegations that he was prejudiced by trial counsel's deficiency, if any, in failing to object to victim impact letters; in allowing the medical examiner and a lay witness to testify beyond the scope of their expertise; in questioning potential jurors at voir dire; in failing to present evidence of Garcia's intermittent work schedule; in failing to ensure a complete record for appeal; or in failing to locate witness William Diaz.
We find only two of Garcia's summarily denied claims worthy of extended discussion. They relate to the cross-examination of (1) Feliciano Aguayo and (2) Elizabeth Feliciano.

1. Feliciano Aguayo
Garcia claims that his trial counsel was ineffective in cross-examining Feliciano Aguayo. Among other things, he claims that Aguayo should have been asked about inconsistencies between his trial testimony and statements attributed to him in an earlier police report. Aguayo initially told investigators that Garcia arrived at his home slightly later on Sunday morning (roughly 8:30 a.m.) and that Garcia repeatedly uttered the phrase "I told him not to make me mad" (not "I told them not to get me mad," as Aguayo testified at trial). Also, Aguayo omitted facts *991 to which he later testified  for example, that on the day of the murders he and his mother visited the field where Garcia claimed to have been attacked, but found no evidence of the event.
We need not analyze whether trial counsel was deficient in cross-examining Aguayo, because Garcia clearly has not demonstrated prejudice. See, e.g., Pietri v. State, 885 So.2d 245, 256 (Fla.2004) ("[A] court considering a claim of ineffectiveness of counsel `need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.'") (quoting Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla. 1986)). At trial, Aguayo admitted that he could not remember precisely when Garcia came to his home, or the specific timing of other events on the weekend of the murder. Nevertheless, his mother confirmed the time when Garcia came to their house, as well as their attempt to investigate Garcia's story later that day. Impeaching Aguayo on those issues would not have affected the outcome. Nor is our confidence undermined by the possibility that Garcia repeatedly said "I told him not to make me mad," rather than "I told them not to get me mad." Garcia had already told Aguayo that two men and a woman randomly attacked him in a field and that he killed one or two of them. Whether he attributed his anger to "him" or "them," his story remained the same. The jury, however, did not believe it. Rather, the jury concluded that Garcia did kill multiple people  but under very different circumstances from those described to Aguayo. We remain confident that the jury would have reached the same conclusion even if Garcia's trial counsel had impeached Aguayo as Garcia suggests.

2. Elizabeth Feliciano
Garcia also alleges that his trial counsel was ineffective in failing to impeach Elizabeth Feliciano, who saw Garcia on the morning of the murders, with an August 1983 police report, which stated that she heard Garcia but "did not see him because she was taking a shower." At trial, confusion arose on this very point. Elizabeth, testifying through a translator, implied on direct examination that as she "was going into the shower" she "was able to see [Garcia] crossing the street, running towards my house." On cross-examination, Garcia's attorney pressed her: "What could you see from the bathroom when you were taking a shower?" Elizabeth clarified that she "had already come out [of the shower] when [she] saw Mr. Henry running." She then recounted the situation in great detail. Given that the jury witnessed this confusion and clarification firsthand, we conclude that trial counsel's failure to impeach the witness with the police report was neither deficient nor prejudicial. The report is the same one that we deemed unreliable in our analysis of whether trial counsel was ineffective in failing to impeach Perez.

F. Cumulative Error
The final claim in Garcia's 3.850 appeal is one of cumulative error. Even when we consider all of his claims cumulatively, however, we remain confident in the outcome. We therefore reject this claim as well.

III. HABEAS CLAIMS
Garcia also petitions this Court for a writ of habeas corpus, raising multiple claims of ineffective assistance of appellate counsel. As we have explained, "[t]he criteria for proving ineffective assistance of appellate counsel parallels the Strickland standard for ineffective assistance of trial counsel." Zack v. State, 911 So.2d 1190, 1204 (Fla.2005) (citing Wilson v. Wainwright, 474 So.2d 1162, 1163 (Fla. *992 1985)). We consider, first, whether appellate counsel made "a serious error . . . falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result." Teffeteller v. Dugger, 734 So.2d 1009, 1027 (Fla. 1999) (quoting Suarez v. Dugger, 527 So.2d 190, 192-93 (Fla.1988)). Each of Garcia's claims will be analyzed under this standard.

A. Incomplete Record
Garcia claims that his appellate counsel was ineffective in failing to ensure a complete record on appeal. He points to three mistakes. First, he claims that appellate counsel should have sought a remand for reconstruction of the record, because many bench conferences at trial were not transcribed. We reject this claim as facially insufficient because Garcia "has not pointed to any errors that occurred during the untranscribed portions of the proceedings." Thompson v. State, 759 So.2d 650, 660 (Fla.2000). Second, Garcia claims that appellate counsel should have sought an evidentiary hearing to determine the actual words used by Perez, whose testimony the trial court corrected. On direct appeal, however, we evaluated this very issue and determined that the correction was "not misleading." Garcia, 644 So.2d at 62. This attempt to relitigate the issue is procedurally barred. Finally, Garcia alleges that appellate counsel should have argued that the trial court violated his due process rights by failing to transcribe certain testimony that the judge read back to the jury. As Garcia acknowledges, however, appellate counsel did argue that the read-back should have been transcribed. We have warned that it is "not appropriate to use a different argument to relitigate the same issue" already decided on direct appeal. Harvey v. Dugger, 656 So.2d 1253, 1256 (Fla.1995) (citing Medina v. State, 573 So.2d 293, 295 (Fla. 1990)).

B. Neighbor's Testimony
Garcia alleges that his appellate counsel was ineffective in failing to challenge "victim impact" testimony by one of the victims' neighbors. As the first witness at the guilt phase, the neighbor described her relationship with the victims and how she relayed news of the murders to one of their nieces, a nun. The defense objected to this testimony on relevancy grounds, but the trial court allowed it. Garcia alleges that appellate counsel was ineffective in failing to challenge the testimony on the grounds of bias, passion, and prejudice, and in failing to argue that Garcia's right to a fair trial was violated. We conclude, however, that appellate counsel adequately challenged the neighbor's testimony. As part of a general prosecutorial misconduct claim, Garcia's brief on direct appeal argued: "Irrelevant references to a victim's family are improper appeals to sympathy. Making the point that such a family member was a nun and doing so through a witness for whom the prosecutor also sought sympathy magnified the impropriety. The prosecutor's actions here ignored her responsibilities and were clearly inappropriate." We rejected this argument on direct appeal, see Garcia, 644 So.2d at 63, and likewise reject Garcia's attempt to relitigate the issue in his habeas petition.
Additionally, Garcia alleges that his appellate counsel provided ineffective assistance in failing to challenge the trial court's denial of a motion for mistrial based on an emotional outburst at the end of the neighbor's testimony. As she was leaving the stand, the neighbor allegedly "thanked the Court, thanked the prosecutor, *993 looked at [defense counsel] and advised [him] that she had just had three heart attacks, in a not very friendly fashion." The trial court denied the defense's motion for mistrial, stating that it "could almost to a certainty say the jury didn't hear her," and that "the witness's testimony, really, was simply for identification, and it doesn't really imply in any way that the defendant is guilty." Even if appellate counsel had challenged this ruling, we clearly would not have granted relief. As we have explained, in "reviewing motions for mistrial dealing with emotional outbursts from witnesses, appellate courts should defer to trial judges' judgments and rulings when they cannot glean from the record how intense a witness's outburst was." Thomas v. State, 748 So.2d 970, 980 (Fla.1999). This is one of those situations.

C. Evidentiary Issues
Garcia alleges that appellate counsel was ineffective in failing to challenge three evidentiary rulings to which his trial counsel objected. We discuss each in turn. First, Garcia's trial counsel objected when the State attempted to bolster Perez's credibility by asking her if she supplied her employer with her social security number. Perez testified that she did supply the number, but the employer's bookkeeper later testified that the number did not appear on any of Perez's payroll records. We agree with Garcia that this testimony constituted improper character evidence. Nevertheless, the error was harmless beyond a reasonable doubt. It is inconceivable that Perez's uncorroborated, self-interested statement could have enhanced her credibility in the eyes of the jury. Thus, an appellate challenge would not have succeeded.
Second, defense counsel objected when the State asked one of its witnesses whether Garcia's employer had "ever produce[d]" the payroll records to investigators. At that point, the defense had not yet attempted to introduce the records. The defense argued that the witness's testimony "was improper impeachment to evidence that I have not yet introduced or attempted to introduce." The trial court responded that "[t]he evidence was entered anticipatorily under our rules as I understand." We need not address the propriety of this ruling, because it clearly did not harm Garcia, who introduced the payroll records later in the proceedings as anticipated.
Finally, defense counsel objected when the trial court permitted a detective to sit at the prosecution's table throughout trial, despite the defense's invocation of the rule of witness sequestration. We have explained that "[t]he rule of witness sequestration is not an absolute rule which must be invoked at the mere request of counsel. The trial judge is endowed with a sound judicial discretion to decide whether particular prospective witnesses should be excluded from the sequestration rule." Randolph v. State, 463 So.2d 186, 191 (Fla.1984). One exception to the rule is for witnesses whose presence is essential to one of the parties. We have explained that "the trial court has wide discretion in determining which witnesses are essential." Knight v. State, 746 So.2d 423, 430 (Fla.1998) (internal quotation marks omitted) (quoting Charles W. Ehrhardt, Florida Evidence § 616.1, at 509 (1998 ed.)). For example, in Knight, a detective was exempted from the sequestration rule because he was essential to the State. We found no abuse of discretion. Although the detective "was a fact witness," we noted that his testimony dealt with information that had been addressed in prior proceedings, and thus his "ongoing courtroom presence did not implicate any of the dangers normally implicit when a *994 witness hears other testimony prior to testifying." Id. The same is true here. The detective was called as a defense witness simply to explain that charges had been filed against the defendant using an alias that also appeared in the payroll records from Garcia's employer. The trial court acted within its discretion in allowing the detective to stay in the courtroom. Appellate counsel cannot be deemed ineffective for failing to raise a meritless claim.

D. Limits on Cross-Examination
Garcia alleges that his appellate counsel was ineffective in failing to challenge the trial court's improper limitation of Garcia's right to cross-examine one of the detectives who testified for the State. Having reviewed the relevant portions of the transcript, however, we conclude that none of the alleged errors was preserved for appeal. Thus, appellate counsel could not have raised the issue successfully.

E. Individualized Sentencing
On direct appeal, we rejected Garcia's claim that the trial court erred in finding no mitigating circumstances. Garcia, 644 So.2d at 63. Garcia now alleges that his appellate counsel was ineffective in failing to bring to our attention a line of cases from the United States Supreme Court Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), and Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). These cases establish that, in evaluating mitigation evidence, the sentencer must "consider[] all relevant facets of the character and record of the individual offender." Skipper, 476 U.S. at 8, 106 S.Ct. 1669. Our ruling on direct appeal complied with this well-known principle. We therefore deny this claim.

F. Cumulative Error
Garcia closes his habeas petition with a claim of cumulative error. Because we remain confident in the result of Garcia's direct appeal, we deny this claim as well.

IV. CONCLUSION
For the reasons given above, we affirm the denial of Garcia's motion for postconviction relief under rule 3.850. We deny his petition for a writ of habeas corpus.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Along with the ineffective assistance claims, Garcia also alleges that these facts constitute newly discovered evidence; that the State violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose them; and that the State violated Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), by presenting them falsely. Like the circuit court, we reject these conclusory claims as meritless. We discuss in detail only the ineffective assistance claims.